963 So.2d 757 (2007)
Alfred ALVAREZ, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D03-2495.
District Court of Appeal of Florida, Third District.
July 5, 2007.
Opinion Granting Clarification September 5, 2007.
*758 Bennett H. Brummer, Public Defender and Anthony C. Musto, Assistant Public Defender, for appellant.
Bill McCollum, Attorney General, and Meredith L. Balo, and Douglas Glaid, Assistant Attorneys General, for appellee.
Before COPE and GREEN, JJ., and SCHWARTZ, Senior Judge.
GREEN, J.
Alfred Alvarez appeals his convictions and sentences for first degree murder, burglary of an occupied dwelling with an assault (without a deadly weapon), kidnapping without a deadly weapon, robbery/carjacking without a deadly weapon, robbery without a weapon, and burglary of an unoccupied conveyance (car). For the reasons which follow, we reverse the conviction and sentence for robbery/carjacking without a deadly weapon, and affirm the remaining convictions and sentences.
The evidence at trial, in the light most favorable to the State, revealed the following: Mr. Eduardo Hernandez, the victim's partner, left for work on the day of the murder at around 7:10 a.m. He testified that when he left his apartment it was clean and organized. The victim, Fernando Gonzalez, beeped Mr. Hernandez around 11:00 a.m., but when Hernandez attempted to contact the victim, he received no answer. He attempted to contact the victim numerous times throughout the day. When Hernandez returned home that evening, he found a broken bottle on the apartment floor. The victim's body was on the master bedroom floor with his hands and feet bound with duct tape and a handkerchief in his mouth. Mr. Hernandez noticed that victim's car was not in the garage, and that the victim's car keys and cell phone were missing. He also later realized that the victim's wallet and some jewelry were missing. Fire-Rescue responded to the scene and declared the victim dead.
Officer Ramos testified that he was dispatched to the scene, and arrived shortly after 9:00 p.m. Detective Alfonso, Sergeant Martinez and Detective Allen were assigned to investigate the murder. When Officer Ramos entered the apartment, he noticed that the apartment generally appeared to be very neat, but he started observing vases and other items lying on the floor. Both Officer Ramos and Detective Alfonso testified that it appeared that there had been a struggle. Officer Ramos then proceeded to the master bedroom which he found to be in shambles. The closet and dresser drawers were open, and it looked like someone had gone through them. Officer Ramos then saw the victim on the floor. He was tied up with phone cords and duct tape with something stuffed into his mouth. Officer Ramos noticed the cords around the victim's neck were very tight. The victim already had signs of rigormortis; he was purple and not breathing. Officer Ramos then secured *759 the scene, and both Officer Ramos and Detective Alfonso canvassed for witnesses.
Through their investigations, they determined that the victim's wallet, including his credit cards, cell phone, and car were missing. Detective Alfonso put out a BOLO for the victim's car, and started tracking the cell phone usage. The State, pursuant to stipulation, then introduced the phone records for the victim's cell phone. The cell phone activity revealed that the phone was traveling north from Dade County up to Fayetteville, North Carolina. After the third day, the police ascertained that most of the cell phone activity occurred in North Carolina.
Detective Alfonso also testified that while they were at the apartment processing the scene, the victim's home phone continued to ring, but no messages were left. The next morning, Sergeant Martinez picked up the phone, and from that point forward, the calls ceased. Police later learned that the calls came from the victim's cell phone.
Detectives Alfonso and Allen went to Fayetteville, North Carolina, where they located the victim's cell phone, radio, pager, and later the victim's organizer and car. The car was located in a lot in Fayetteville.
The detectives obtained a video surveillance of the suspects using the victim's credit card at a gas station in Orlando. With that picture, the detectives went to a Greyhound bus station where three people recognized the men in the picture. Detective Alfonso spoke with a Dina Agers who described one of the suspects as Hispanic, about 5'7" tall, weighing 190 pounds. He wore a white shirt with stripes and dark pants or jeans. He had black hair and emerald green eyes. Detective Alfonso then showed Ms. Agers the photograph made from the gas station's video camera. Ms. Agers identified the suspect, saying "this is the gentleman with the green eyes. This is the person who purchased two one way tickets to New York on April 24th at 12:17 p.m., 1996." Ms. Agers said the name of the man who purchased the tickets was "A. Alvarez." Another witness, Tanisha Coleman, corroborated Ms. Agers description and the suspects' destination.
After returning to Miami, Detective Alfonso obtained Alvarez's driver license photograph and prepared a photographic lineup. The detectives went to the Dadeland Mall with the photographic lineup. Eddie Fusa and Odra Aguilar, two store clerks at the mall, identified appellant Alvarez as someone to whom they sold merchandise. Detective Alfonso then prepared a warrant for Alfred Alvarez's arrest. Alvarez was finally located in New York in February 1998.
The State presented the testimony of Audrey Stevens, the manager of 11 Orlando area Amoco stores, including one referred to as the "airport store." Ms. Stevens testified that the airport store was equipped with a surveillance camera that records what the cashier was registering along with the taping. The system would record the person's name, credit card number, and the total sale amount. Ms. Stevens testified that the video camera ran continuously, and the images went to a VHS cassette. These videos were kept locked up in her office cabinet as a matter of business, and only she had access to the keys of the machine. The defense objected on the grounds of a lack of predicate for the introduction of the video tape. After some further clarification as to where the tape was kept and who had access to it, the judge overruled the objection, and the still photographs were admitted into evidence.
Detective F. Castillo testified that as a result of the investigation, he went to the *760 Amoco station in Orlando and spoke with Ms. Stevens. Ms. Stevens described the subjects as two dark-complexioned Latin males. Detective Castillo obtained the video tape of the transaction. The tape showed the suspects and their clothing. They took still photos of the video depicting the appellant and co-defendant. The detective was also able to recover the receipt of the credit card transaction. These receipts were then introduced into evidence pursuant to stipulation.
Detective Mike Narganes testified that he was assigned to go to Dadeland Mall to "check out some sales receipts." Detective Narganes visited several stores including: Stewart Cantor, Kids, Champs, and Jean West. The State introduced receipts from: Stewart Cantor, totaling $127.27; Kids store, for $74.80; Champs, for $218.30; and Jeans West, totaling $169.87. The clerks at the stores were able to give similar descriptions of the appellant, and identified him from the photographic lineup.
Dina Agers testified that she sold tickets for Greyhound on the date in question. Ms. Agers sold two, one-way tickets to the appellant. She testified that the person who purchased the tickets provided the name "Alvarez."
Technician Theresa Collins testified that she processed the victim's body at the scene. Technician Collins observed that the victim's front pockets were turned out, and he had the curly part of a telephone cord wrapped around his neck along with a pen cap and a little metal clip. There was a dish rag nearby with blood on it. The victim's wrists were bound by the telephone cord and duct tape, and he had a brown belt around his arms that was secured in the back of his body. Technician Collins collected the evidence and placed it into the property unit. After transporting the evidence, Technician Collins processed the items for fingerprints. She was unable to collect any fingerprints from the duct tape or phone cord binding the victim's body. She was able to retrieve a fingerprint from a roll of duct tape that was found on the kitchen table.
At the scene, Technician Collins noticed that the mini-blinds from the spare bedroom were on the floor. She also processed what appeared to be a shoe print on the floor. After receiving the receipts of the appellant's purchases, Technician Collins processed them for fingerprints. She retrieved fingerprints from a cardboard paper and receipts sent to her by the detectives in North Carolina. She was unable to lift any prints from the victim's credit card. Additionally, Officers Hector Infonte and Andre Bettincourt lifted prints from the bedrooms, kitchen, and living room. Prints were lifted from the telephone base, vertical blinds found on the north bedroom's floor, and the handle of a water pitcher found on the kitchen counter.
Guillermo Martin, the latent print examiner, testified that he found the appellant's prints on various receipts, a roll of duct tape from the dining room table, a piece of cardboard, the telephone base from the floor in the south bedroom, a vertical blind found on the floor of the north bedroom, and the handle of the water pitcher found on the kitchen counter. Mr. Martin also found ten prints from the victim and thirty prints from Herber Frias the co-defendant in this case. Mr. Frias's prints were located on the telephone base, a mirrored closet door in the south bedroom, a business card from a chest of drawers in the master bedroom, and a telephone handset found in the south bedroom. Mr. Martin acknowledged that there is no way to determine when the prints were left. Mr. Martin explained that he examined prints for two suspects, but that the prints found on the *761 duct tape belonged to Alfred Alvarez, not Herber Frias. Additionally, the prints found on the telephone base came from both the appellant and Mr. Frias.
Dr. Emma Lew testified that when she arrived at the scene, she noticed that the victim's face and neck were dark purple with multiple tiny hemorrhages on the skin and eyes, including multiple hemorrhages on the muscle of the neck. There were small abrasions on his left cheek, the left side of his chin, as well as bruises on his lips, tongue, and neck. Dr. Lew testified that the bruising on the tongue was consistent with something being force deeply into his mouth. The victim also suffered four broken ribs. Dr. Lew determined that the death was caused by asphyxiation. Dr. Lew also took swabs from the victim's penis, mouth, and anus to check for DNA, sperm, and semen fluid.
The State then rested, and the defense moved for a judgment of acquittal. The judge denied the motion as to first degree murder, burglary, and kidnapping with a weapon, and reserved ruling on the charges of carjacking, armed robbery, and burglary of a conveyance.
The defense then sought to present the testimony of Mrs. Corrosco, who would have testified that Mr. Frias admitted to her that he murdered a man in Miami, then stole the man's credit cards and car. The defense argued that her testimony was admissible as a statement offered against a party to exonerate the appellant. The State argued that the witness's testimony was going to be used to impeach the co-defendant, who had not testified, and that the statement would be hearsay. The Court ruled that her testimony was not admissible because the defense could not anticipatorily impeach a witness before that witness testified. The defense argued that the statement was an admission against interest, and the co-defendant was a party to the litigation. The Court prohibited the defense from calling the witness, reasoning that the co-defendant was no longer a party to the case since his case was severed and tried separately. The court also ruled that the statement was not admissible as an admission against interest where the co-defendant was not unavailable.
The Court then read to the jury a stipulation by the parties that the oral, rectal and esophagus swabs tested negative for semen; that the penile swabs tested positive for semen; that the oral and rectal smears tested negative for sperm; that the penile smear tested positive for sperm; and that hair strands and blood sample were not tested.
The defense's first witness, Teresa Collins, testified that she was the lead crime scene technician in this case. Ms. Collins testified that she lifted a footwear impression from the mini-blinds that were on the floor of the apartment. Ms. Collins sent the impression, along with shoes she received from the medical examiner's office that were worn by the victim, to the Metro Dade lab for analysis. She also sent a pair of size 10 Reebok tennis shoes that she received from North Carolina to the lab for analysis.
Robert Hart, a criminalist at the Miami Dade Police Department, testified that he compared the footwear impressions to the two pairs of shoes. Mr. Hart testified that all of the print impressions he received could have been made by the two pairs of shoes.
The appellant testified that he came to Miami in 1996 and ended up in a homeless shelter after someone stole his money at the airport. He met the victim at the shelter, and the victim offered to help the appellant get a job. The victim helped the appellant get a social security number, *762 bought him shoes, and took the appellant to his apartment to eat and listen to music about five or six times. The appellant testified that he entered both bedrooms to try on clothing. In return for his generosity, the victim wanted to have sex with the appellant, but the appellant turned down his request. Despite this, their friendship did not end.
The appellant testified that he met his co-defendant, Frias, at the shelter. The appellant told Frias about the victim, and eventually introduced Frias to the victim so they could engage in sexual activity. On the date of the murder, the victim went to the shelter to pick up both appellant and Frias. They all arrived at the victim's apartment and ate. The appellant further testified that he remained in the living room while the victim and Frias went to the bedroom. The appellant further testified that he asked for the car keys and waited downstairs in the car.
After 30 or 45 minutes, the appellant testified that he went back upstairs because he was hot and irritated, and he wanted to see if they were finished. The appellant knocked on the door, and Frias answered. Frias was only wearing pants. The appellant went in and asked if they were finished. Frias said that they were not finished yet. The appellant asked for something to drink, and went to the refrigerator and took out a malt drink. He sat at the table to drink the malt.
The appellant testified that he could not see inside any of the bedrooms, and he heard no noises or screaming. He saw a broken bottle, but he was not overly concerned about it. He also played with a roll of tape while he drank his malt. The appellant did not take the roll of tape to the apartment that day, and he had not seen it before then. Frias was with the appellant the entire time he drank his malt. The appellant never saw the victim come out of the bedroom. The appellant then went back downstairs, and about fifteen or twenty minutes later Frias emerged from the apartment with a backpack. Frias handed the appellant a credit card from the victim's wallet, and said that they had the victim's permission to buy some clothing.
The two then went to Dadeland Mall. Since the appellant was dressed better, Frias told him to use the credit cards. The appellant bought clothes and shoes for himself and Frias. The appellant also bought some baby clothes for his daughter. The appellant returned to the car, showed Frias what he purchased, and said "let's go back to where Gonzalez is." Frias became irritable and said they were not going back to the apartment. Frias then told the appellant what had happened to the victim and why they could not go back to the apartment. The appellant testified that he felt very uncomfortable. The appellant did not leave Frias because Frias threatened him and the appellant was fearful of him.
Frias told the appellant to drive north because he wanted to go to New York. The appellant decided to go along, and then inform someone in New York what happened. While en route to New York, Frias made phone calls to the victim's apartment to see if anyone had discovered the victim. Eventually someone answered the phone at the victim's apartment. Frias then told the appellant that they had to exit the car.
Frias removed the radio and sold it to purchase two bus tickets to New York. When they arrived in New York, Frias had no place to stay, so he stayed with the appellant. When Frias finally left, the appellant did not contact his DEA friends about what happened in Florida because he feared that he was involved and thought he would end up going to jail. According *763 to his testimony, he "didn't give it a lot of importance." The appellant testified that although he wears a size 8½ shoe, and did not recognize and never wore, the shoes introduced into evidence. The appellant further denied kidnapping, robbing, carjacking, or tying up the victim.
On cross examination, the appellant acknowledged that the victim's apartment was ordinarily very neat, and that everything was always kept in its place. The State had the appellant demonstrate how he played with the duct tape on the date of the murder as opposed to how he would have pulled a piece of tape from the roll. The State attempted to demonstrate that if the appellant had just played with the tape, his fingers would smudge, but if he took a piece of tape from the roll, his fingers would not smudge. The Appellant testified that his prints were on the water pitcher because he touched it while making sandwiches. He also stated that he touched the mini-blinds on prior visits, and used the phone about three or four days earlier.
The appellant further testified that when he was robbed and in trouble upon his first arrival in Miami, it was his gut instinct to call his DEA friend, but not when he was in trouble this second time. He also figured that someone simply dropped the bottle that was broken in the victim's apartment. The appellant denied telling New York detectives that he took the victim's keys from the floor of the first bedroom, but told the detectives the same story he just told the jury.
Although Frias was arrested prior to the appellant and the appellant was aware of Frias' arrest, the appellant never came forward as a witness against Frias. The appellant admitted to a previous conviction of a crime involving dishonesty.
The defense rested. The defense renewed all previous objections and made its second motion for judgment of acquittal, which the court denied. The jury found the appellant guilty of First Degree Murder, as charged, in Count One; Burglary with an assault, without a deadly weapon, of an occupied dwelling in Count Two; Kidnapping Without a Weapon in Count Three; Robbery/Carjacking Without a Deadly Weapon in Count Four; Robbery, without a deadly weapon and without a weapon in Count Five; and Burglary of an Unoccupied Conveyance in Count Six. The court adjudicated the appellant guilty of the charges, and sentenced him to life in prison on Counts One, Two and Three, to thirty years in prison in Count Four, to fifteen years in prison in Count Five, and five years in prison as to Count Six, with credit for time served. The court further ordered the sentences in Counts One through Three to run concurrent with each other; Count Four to run consecutive to Count Three; Count Five to run consecutive to Count Four; and Count Six to run consecutive to Count Five.
On September 2, 2003, the appellant filed a Motion for New Trial arguing that the trial court erred in sustaining the State's objection to the proposed testimony as to what and when the co-defendant told him about the victim. The appellant filed a Notice of Appeal on September 17, 2003, however, this Court relinquished jurisdiction to the trial court for thirty days to allow the trial court to hear and rule on the motion for new trial.
In its response to appellant's motion for new trial, the State argued that the statements sought to be admitted by appellant were hearsay because they were elicited only for the truth of the matter asserted therein. The court denied the motion.
On November 30, 2004, the appellant filed a Motion to Correct Sentencing Error, and argued that the trial court erred *764 in departing upwards from the guidelines based on Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). The trial court never ruled on the motion.
The appellant raises several issues on appeal. Only two warrant discussion because the remainder have not been properly preserved for our appellate review.
The appellant first asserts as error the trial court's denial of his motion for judgment of acquittal. He argues that the State did not refute the reasonable hypothesis of innocence which was that he was outside the apartment when Frias committed the crimes inside the victim's apartment. We disagree as we conclude that the State adduced evidence that was inconsistent with the appellant's theory of events. See Beasley v. State, 774 So.2d 649 (Fla.2000). The state presented evidence that the appellant was on the scene, and that his fingerprints were on the tape used to bind the victim, as well as on the base of the telephone whose cord was used to bind the victim. This court has held that when fingerprints are the sole evidence on which the State relies to convict a defendant the State must demonstrate that "the print could have been made only at the time the crime was committed." Sorey v. State, 419 So.2d 810, 812 (Fla. 3d DCA 1982)(quoting Tirko v. State, 138 So.2d 388, 389 (Fla. 3d DCA 1962)). However, the State met this burden in this case. The State introduced evidence that the prints found in the apartment were of such a nature that they were recent and could reasonably have been placed there on the day of the crimes. The appellant testified that he was in the apartment and demonstrated to the jury how he played with the roll of tape on that day. Based on his demonstration, the jury was entitled to infer that had he only played with the roll in the manner he demonstrated, his prints should have been blurred; they were not. Additionally, the co-perpetrator's prints were not found on the tape.
The prints of both the appellant and the co-defendant were found on the phone base. This permitted an inference by the jury that the prints were placed there by the persons who used the cord to tie the victim. Thus, because the State introduced enough evidence to contradict the appellant's hypothesis of innocence, we find no error in the court's denial of the motion for judgment of acquittal. Lynch v. State, 293 So.2d 44, 45 (Fla.1974); State v. Law, 559 So.2d 187, 189 (Fla.1989)(when state introduces evidence to exclude reasonable hypothesis of innocence beyond reasonable doubt jury is entitled to determine if innocence is refuted).
We are, however, persuaded by appellant's argument that his conviction for robbery/carjacking without a deadly weapon cannot stand.[1] We agree that the evidence introduced at trial, viewed in the light most favorable to the State, demonstrates that the victim could not have been subjected to "the use of force, violence, assault, or putting in fear during the course of the taking of the motor vehicle." Flores v. State, 853 So.2d 566, 569 (Fla. 3d DCA 2003)(citing § 812.133(1), Fla. Stat. (1999)). Here, as in Flores, the victim was unaware of the theft. We conclude, as we did in that case, that under these circumstances the legislature did not intend for a carjacking conviction to lie. Hence, we reverse the carjacking conviction and remand *765 with instructions to reduce the conviction to grand theft of an automobile.
Affirmed in part; reversed in part and remanded.
SCHWARTZ, Senior Judge, concurs.
COPE, C.J. (specially concurring).
I agree with the result and agree with almost all of the majority opinion.
My reasoning differs regarding Point II of the appeal of defendant-appellant Alvarez. The defendant asserts that the trial court erred by sustaining a state hearsay objection. The majority opinion finds the point inadequately preserved for appellate review. I believe that defense counsel's reference to a sidebar which had occurred a few minutes previously was sufficient for preservation purposes, and the trial court erred by sustaining the hearsay objection.
However, I am convinced that the error was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). The erroneous ruling occurred during the defendant's testimony. The defendant's other testimony in the case made abundantly clear his claim that he had nothing to do with the murder and learned of it only after the fact. Since the point was covered by the defendant's other testimony, the error was harmless.

On Motion for Clarification
We grant the appellant's motion for clarification and add the following to our opinion in the cause, filed July 5, 2007.
We affirm defendant's sentences as we are not persuaded by the argument that the court erred in departing upwards from the guidelines. Luton v. State, 934 So.2d 7 (Fla. 3d DCA 2007), review granted, 944 So.2d 345 (Fla.2007)(oral argument held 6/7/07).
NOTES
[1] We find that this case falls under the rule that "an argument that the evidence is totally insufficient as a matter of law to establish the commission of a crime need not be preserved." Such complete failure of the evidence meets the requirements of fundamental error[.] F.B. v. State, 852 So.2d 226, 230-31 (Fla.2003).