# Supreme Court of Florida

_____

No. SC12-407
_____

**WILLIAM JAMES DEPARVINE,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC12-2124
_____

**WILLIAM JAMES DEPARVINE,**
Petitioner,

vs.

**MICHAEL D. CREWS, etc.,**
Respondent.

[August 28, 2014]
<u>**REVISED OPINION**</u>

PER CURIAM.

William James Deparvine appeals an order of the circuit court denying his

initial postconviction motion to vacate his conviction of first-degree murder and

sentence of death filed under Florida Rule of Criminal Procedure 3.851. He also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. As explained below, we affirm the postconviction court's denial of relief on all claims and deny Deparvine's petition for a writ of habeas corpus.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

The facts of this case were set forth on direct appeal in Deparvine v. State, 995 So. 2d 351, 356-61 (Fla. 2008). They are summarized here. Deparvine was convicted of the November 25, 2003, first-degree murders of Rick Van Dusen (Rick) and Karla Van Dusen (Karla), as well as one count of armed carjacking of Rick's 1971 Chevrolet Cheyenne pickup truck (Cheyenne) in Hillsborough County, Florida. The State's theory of the case at trial was that Deparvine responded to the Van Dusens' attempts to sell the Cheyenne and subsequently murdered them in a plot to take the Cheyenne. Id. The jury recommended that Deparvine be sentenced to death on both murder counts by a vote of eight to four. The trial court sentenced him to death.

The Van Dusens ran multiple ads from February 11, 2003, to November 20, 2003, seeking to sell the Cheyenne for as high as $18,900 to as low as "$13,700 or partial trade for four wheel drive jeep." Id. at 356. On November 25, 2003, the Van Dusens, believing they were completing the sale of the Cheyenne to

Deparvine, drove to Deparvine's apartment. Rick drove the Cheyenne and Karla followed in their 2001 Jeep Cherokee (Jeep). The Van Dusens' cell phone records indicated that between 4:45 p.m. and 6:37 p.m., they moved from their home in Tierra Verde through the St. Petersburg area and ended up north of St. Petersburg around the Oldsmar area. Id. at 357. Phone records showed that Karla spoke to her mother, Billie Ferris, at approximately 5:54 p.m. Id. This phone call began by using a cell tower located on Central Avenue in St. Petersburg, near Deparvine's apartment, and lasted approximately thirty-seven minutes, ending with the use of the cell tower in Oldsmar. Over defense counsel's objections, Ferris testified that during this conversation, when she heard the motor of the car running in the background, she asked Karla whether she was in the car, and Karla responded:

> A: I'm following Rick and the guy that bought the truck. He knows where to get the paperwork done tonight.
> ....
> Q: [State]: Did Karla Van Dusen tell you how the guy was going to pay for the truck that night?
> A: She said he's got cash.

Id. The next morning the bodies of Rick and Karla were found along a dirt road next to a residence, approximately 3.4 miles away from the last recorded cell tower used by the Van Dusens in Oldsmar. Rick was shot once in the back of the head. He was found with his wallet and money clip containing eighty-three dollars, two gold rings, a cell phone, and a watch. Karla was shot twice in the head and stabbed

twice in the chest.  She was found with four gold rings, gold hoop earrings, and a watch.  Id.  A knife blade and nine millimeter shell casing were discovered under her body.

The Jeep Karla was driving was discovered 1.3 miles away from the Van Dusens' bodies at Artistic Doors, a local business.  Id.  The windshield was cracked and detectives recovered a bullet fragment from the dashboard, a shell casing between the passenger front seat and the doorway, and a bullet fragment on the front passenger floorboard.  On the ground next to the Jeep on the driver's side was a Florida identification (I.D.) card issued on November 26, 2002, belonging to Henry Sullivan.  Id.

Chief forensic print analyst Mary Ellen Holmberg analyzed one print of value for comparison lifted from Sullivan's ID card, which remained unidentified.  Id.  Further, the Van Dusens' Cheyenne did not make the tire marks around the Jeep.  Id. at 357-58.  Bloodstains, however, were found throughout the driver and passenger sides of the Jeep.  Four of five blood samples taken from different points on the steering wheel of the Jeep matched Deparvine's DNA, including one mixture bloodstain containing Deparvine's and Rick's DNA.  Id. at 358.  Two additional blood samples taken from different locations on the steering wheel of the Jeep were analyzed by a private laboratory.  The samples matched Deparvine, thus six different bloodstains on the steering wheel were linked to Deparvine.

On November 27, 2003, the Van Dusens' Cheyenne was discovered parked behind Deparvine's apartment. A search of Deparvine's apartment was conducted on December 24, 2003, pursuant to a warrant. A notarized bill of sale from Rick to Deparvine dated November 25, 2003, was discovered indicating a purchase price of $6,500. Susan A. Kienker, who notarized the bill of sale, later testified that Rick, whom she knew personally, asked her to notarize the bill of sale on November 25, 2003, and handwriting expert Don Quinn confirmed Rick's handwriting on the bill of sale as authentic.

George Harrington testified that he came into contact with Deparvine in August 2003, when Harrington was seeking to sell his 1996 F–150 pickup truck for approximately $7,800. Id. Harrington testified that Deparvine wanted to purchase the pickup truck, but before he did, he asked to take the truck to Oldsmar where his mechanic friend would inspect it. Id. Deparvine indicated that he would pay for the truck in cash, which he kept at his friend's house in Oldsmar. Id. Deparvine gave Harrington a blank bill of sale and told him to have it notarized, which he did, but the sale was never completed.

Deparvine testified that he had been looking to purchase a pickup truck during the six-month period preceding November 2003. He said that he saw the Van Dusens' ads from February to November and inquired about the Cheyenne in February, July, September, and November. Deparvine testified that on Sunday,

November 23, 2003, Rick invited him to the Van Dusens' house in Tierra Verde

and offered to let Deparvine test drive the Cheyenne. Id. Deparvine drove and

Rick accompanied him, but within three-quarters of a mile, the Cheyenne ran out

of gas and the two men walked back to the Van Dusen home. Id. At the home,

Rick picked up a can of gas, and the two men rode in the Jeep back to the

Cheyenne with Rick driving.[1] Id. at 359. Rick poured gas in the gas tank, but the

Cheyenne did not start. Deparvine then primed the carburetor.[2] During this

process, Deparvine stated that he opened a wound and scab under his right index

finger, which originated as a cut he received at work. After finally starting the

Cheyenne, the two drove back to the Van Dusens' home, with Deparvine, bleeding

from his finger, driving the Jeep. Id.

Deparvine also testified that he told Rick that he only had $6,500 in cash to

pay for the Cheyenne, which Rick accepted because he wanted to get rid of it. Id.

Deparvine then testified that he paid $1,500 in cash as a deposit. Deparvine gave

Rick a blank bill of sale for Rick to complete and they agreed that the Van Dusens

---

1. In its rebuttal case, the State recalled Sergeant Harry Hoover (formerly a detective), who testified that on November 27, 2003, he interviewed Deparvine, who stated at the time that when the truck ran out of gas, "he, Rick and Karla drove back to get gas and filled the truck up." Deparvine, 995 So. 2d at 358, n.1.

2. Deparvine testified that this involves pulling the air cleaner assembly off the carburetor and pouring gas into the carburetor while another person turns the key in the ignition.

would deliver the Cheyenne to Deparvine's apartment complex in central St. Petersburg on Tuesday, November 25, 2003, after 5 p.m.

On November 25, 2003, at approximately 5:30 p.m., Rick, driving the Cheyenne, and Karla, following in the Jeep, arrived at the apartment complex. Deparvine testified that he told the Van Dusens to drive around to the back parking lot of the complex to complete the sale. Id. Deparvine then testified that he noticed a person who seemed to be with the Van Dusens driving a red vintage truck that was similar to the Van Dusens' Cheyenne. Id. Deparvine described the driver of the similar truck as a white male in his mid-fifties with a salt-and-pepper-colored beard, a receding hairline, and wearing sunglasses. On cross-examination, Deparvine admitted that this description was consistent with his own appearance. Id. Once at the back parking lot, Rick exited the Cheyenne and entered the passenger side of the Jeep. Deparvine entered the Jeep and sat in the backseat behind Karla. Id. According to Deparvine's testimony, Deparvine then paid the $5,000 remaining balance of the sales price in cash and Rick gave him a notarized bill of sale indicating a purchase price of $6,500. Rick, however, had not been able to find the title but agreed to send it to Deparvine after Thanksgiving. After Deparvine exited the Jeep, Rick entered the similar red vintage truck Deparvine had seen and the two vehicles left, with Karla following in the Jeep. Id. Deparvine

testified that after the Van Dusens left he did not leave the vicinity of his apartment complex.  Id.  He denied killing the Van Dusens.

Deparvine, whose bank statement never contained more than $826.21 between June 27, 2003, and December 31, 2003, testified that he obtained the funds to purchase the vehicle by selling a Rolex watch that he inherited while he was in prison from a terminally ill inmate named Bill Jamison, whom he had befriended.  Id. at 359-60.  Deparvine sold the watch for $7,000 to "a couple of Hispanic guys."  Id.  Deparvine could not give any other description of these buyers.  Deparvine testified that he kept the cash at his apartment.

After presentation of all the evidence, on August 3, 2005, a jury found Deparvine guilty of both counts of first-degree murder and one count of armed carjacking.  Id.

### Penalty Phase

During the penalty phase, the State presented the testimony of Officer Richard Gordon, who testified that on April 28, 2003, Deparvine was on conditional release for possession of a firearm by a convicted felon and carrying a concealed weapon.  Id.  The State then presented five witnesses as victim-impact testimony: (1) Michelle Kroger, Rick's youngest daughter; (2) Jay Meyers, Karla's son; (3) Christine Crawford, who read a statement prepared by Rene Koppeny, Rick's other daughter; (4) Morene Cancelino, Rick's sister, who read a statement

- 8 -

prepared by Rick's other sister, Jacqueline Bonn; and (5) Billie Ferris, Karla's mother. The defense presented three witnesses. Sara Flynn, a mitigation specialist, testified about Deparvine's background.

On August 4, 2005, the jury recommended that Deparvine be sentenced to death by a vote of eight to four on both murder counts. Id. at 361. A Spencer[3] hearing was held on November 22, 2005, wherein two witnesses testified. Dr. Eric Rosen, a psychologist, testified that Deparvine showed "elevated scales for depression and also for psychopathic deviance," and that although he does not suffer from a "full personality disorder," he suffers from personality disorder traits and was diagnosed as having dysthymic mood disorder, which is a type of depression. Id. Nevertheless, Dr. Rosen testified that Deparvine was above average in intellect and that his personality disorder shaped the choices he made, but did not limit his ability to make choices.

On January 9, 2006, the trial court sentenced Deparvine to death, finding four aggravating factors and giving them all great weight. Id. The trial court found that the murders were: (1) cold, calculated and premeditated ("CCP"); (2) committed for pecuniary gain; (3) committed by a person previously convicted of a felony and under sentence of imprisonment, or placed on community control, or on felony probation; and (4) committed by one previously convicted of another

_____

3. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

capital felony.  Id.  The trial court gave little weight to Deparvine's mitigating circumstances, finding that Deparvine: (1) suffered from serious emotional deprivation as a child because of familial dysfunction; (2) suffered from an inability to form and maintain close relationships with others; (3) suffered from estrangement from some family members; (4) persevered after marrying his teenage girlfriend, who had become pregnant, and worked hard to put himself through college and law school; and (5) was once a true family man and his children grieve at his predicament.

**Direct Appeal**

On direct appeal, Deparvine raised several claims.  First, Deparvine argued that the trial court erred in admitting Ferris' testimony regarding Karla's statements about where she was and whom she was with during the telephone conversation that ended in Oldsmar.  This Court ruled that the statement "I'm following Rick and the guy that bought the truck" was admissible as a spontaneous statement exception to hearsay.  Deparvine, 995 So. 2d at 371.  The Court, however, found the statements, "He knows where to get the paperwork done tonight," and "[h]e's got cash," inadmissible.  Id.  Nevertheless, the Court ruled that the admission of those statements was harmless error.  Id.

Second, Deparvine contended that the indictment charging him with two counts of first-degree murder was void for failure to specify whether the State

- 10 -

would pursue a conviction under a theory of premeditation or felony murder. Id. The Court rejected this claim, noting that trial counsel did not raise this issue prior to trial, but waited until the State rested its case, which necessitated a showing by Deparvine that the indictment was so fundamentally defective that it could not support a judgment of conviction. Id. at 373. The Court also rejected the related claim of error to allow a jury instruction that stated that the jury could find premeditated murder, felony murder, or both, when the indictment only charged first-degree murder citing the statute. Id. Third, Deparvine also contested several aspects of the carjacking charge: the indictment, the jury instructions, the jury's unanimity in reaching a verdict, and the sufficiency of the evidence. The gist of the argument, however, was that the Cheyenne was never specified as the subject motor vehicle of the carjacking charge in the indictment, and that the State's arguments and the jury instructions confused the jury regarding whether the Cheyenne or the Jeep was the carjacked vehicle. Id. at 375. The Court rejected his arguments finding that Deparvine failed to attack the indictment on those grounds in the trial court, and that the record showed that the State repeatedly argued to the jury that the Cheyenne was the subject of the carjacking charge. Further, the Court noted that trial counsel did not object to the instructions on the basis raised on direct appeal and the error complained of was not fundamental. Id. Finally, the Court found sufficient evidence to support the carjacking conviction: "a reasonable

jury could infer from the evidence that the taking was the consequence of a continuous series of acts or events all focused on the taking of the truck." Id. The Court also independently reviewed the sufficiency of the evidence and held that there was sufficient evidence to support his conviction. Id. at 378.

Deparvine also raised claims of error regarding the penalty phase. First, Deparvine argued that the trial court allowed the State to present too many victim impact witnesses. Further, he argued that the trial court erred by allowing the victim impact witnesses to display photographs during their testimony. The Court rejected both claims. Second, Deparvine argued that the trial court erred by granting the State's for-cause challenge of juror Daryl Rucker. The Court held that Deparvine was procedurally barred from raising the issue on appeal because trial counsel did not make any specific contemporaneous objections. Id. at 379. Third, Deparvine challenged the constitutionality of Florida's capital sentencing scheme pursuant to Ring v. Arizona, 536 U.S. 584 (2002). This Court rejected the claim holding that "Deparvine's claim is without merit since it is undisputed that he has prior felony convictions." Deparvine, 995 So. 2d at 379 (citing Marshall v. Crosby, 911 So. 2d 1129 (Fla. 2005)). Fourth, Deparvine challenged the sentencing order, alleging it was defective because it failed to indicate the mitigating circumstances found and it failed to address Dr. Rosen's testimony regarding Deparvine's mental health disorders. The Court held that the sentencing

order clearly indicated the mitigating circumstances found, but held that the trial court failed to expressly evaluate Dr. Rosen's testimony. However, the Court held this error was harmless because the trial court gave great weight to four aggravating circumstances, including CCP and prior violent felony, and gave little weight to the mitigating circumstances. Deparvine, 995 So. 2d at 381. This Court then independently conducted a proportionality review finding that the sentence was constitutionally proportional. Id. at 383. Accordingly, the Court affirmed Deparvine's convictions and sentences.

**Motion for Postconviction Relief and this Appeal**

Deparvine filed his initial motion for postconviction relief on February 5, 2010, in which he raised twenty-eight claims. An evidentiary hearing was held on February 7-9, 2011, on eighteen of those claims. Deparvine presented testimony from several witnesses, including Deparvine and John Skye, his counsel at trial. Forensic analysts, lay witnesses, and law enforcement officers also testified in support of Deparvine's postconviction claims. On December 6, 2011, the circuit court entered its lengthy order denying relief. The details of the postconviction court's ruling, and of the relevant testimony and evidence introduced at the evidentiary hearing, will be discussed below.

In this appeal, he raises twenty-one claims, some with sub-issues.[4]

Deparvine has also filed a habeas petition raising two claims of ineffective

assistance of appellate counsel pursuant to article V, section 3(b)(9), Florida

Constitution. We discuss each issue in turn.

## ANALYSIS

### I. Postconviction Appeal

### 1. Ineffective Assistance of Counsel Claims

Standard of Review

To successfully prove a claim of ineffective assistance of trial counsel, a

defendant must satisfy both prongs of the Strickland[5] test as follows:

> First, the claimant must identify particular acts or omissions of
> the lawyer that are shown to be outside the broad range of reasonably
> competent performance under prevailing professional standards.
> Second, the clear, substantial deficiency shown must further be
> demonstrated to have so affected the fairness and reliability of the
> proceeding that confidence in the outcome is undermined.

---

4. Deparvine raises: (1) fourteen ineffective assistance of counsel claims;
(2) six constitutional challenges to Florida's capital sentencing statute, lethal
injection and accompanying procedures, and juror interview procedures; and (3) a
claim that the combination of cumulative errors deprived him of a fair trial.
Deparvine also raises related newly discovered evidence and due process claims as
part of one of the ineffective assistance of counsel claims. Finally, Deparvine
raises a fifteenth ineffective assistance of counsel claim as a related claim to one of
the constitutional challenges.

5. Strickland v. Washington, 466 U.S. 668 (1984).

Simmons v. State, 105 So. 3d 475, 487 (Fla. 2012) (quoting Ferrell v. State, 29 So. 3d 959, 969 (Fla. 2010) (quoting Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986) (citations omitted))).  Because ineffective assistance of counsel claims present mixed questions of fact and law, the Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo.  See Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004).

There is a strong presumption, however, that trial counsel's performance was not ineffective, and judicial scrutiny of counsel's performance is highly deferential.  See Strickland, 466 U.S. at 689-90.  To assess attorney performance, courts must eliminate the distorting effects of hindsight and evaluate the challenged conduct from counsel's perspective at the time.  Id. at 689.  The defendant carries the burden to overcome the presumption that the challenged action may be considered sound trial strategy.  Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct."  Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000).

The Court does not reach both Strickland prongs in every case.  "[W]hen a defendant fails to make a showing as to one prong, it is not necessary to delve into

whether he has made a showing as to the other prong." Preston v. State, 970 So. 2d 789, 803 (Fla. 2007) (quoting Stewart v. State, 801 So. 2d 59, 65 (Fla. 2001)). With these principles in mind, we turn to Deparvine's claims of ineffective assistance of counsel in the guilt phase of his trial.

## A. Failure to Call Daryl Gibson as an Alibi Witness

Deparvine alleges that trial counsel was ineffective for failing to call Daryl Gibson—who lived in the same apartment building as Deparvine on November 25, 2003—as a defense witness at trial. According to Deparvine, Gibson's potential testimony—that he saw Deparvine around dusk on the night of the murders— would have conflicted with the State's theory that the Van Dusens and Deparvine were miles north of St. Petersburg by then. For the following reasons, we affirm the postconviction court's denial of relief on this claim.

After much reluctance, Gibson testified in the postconviction proceeding that he remembered seeing the Van Dusens, Karla in the Jeep and Rick in the Cheyenne, and Deparvine at the front of the apartment building on the day of the murders. He also testified that he remembered seeing Deparvine a little later that day, November 25, 2003, when there was still light and the "sun was going down." He also stated that it was approximately half an hour later when he saw Deparvine coming from the back of the building, but clarified that he never saw a third person or a second red truck, and that he would have refused to testify at trial.

- 16 -

Trial counsel also testified at the evidentiary hearing about his reasoning for not calling Gibson as a defense witness. Trial counsel testified that Gibson would be a bad witness because he provided inconsistent statements, two of which would be devastating, and the third, which was potentially exculpatory, would be "roundly and soundly impeached." In Gibson's first interview with police, he denied having seen or heard anything. In a second police interview almost a year later, Gibson, who by then was incarcerated and facing multiple charges including attempted first-degree murder, provided information that trial counsel considered "quite damaging." In that interview, Gibson stated that he witnessed Deparvine meet Rick and Karla in front of the apartment building wearing a ball cap and a backpack, saw Deparvine gesture towards the north, heard Karla ask "how far is it?" but did not hear the answer, and did not see a second red truck or observe the Cheyenne in the back parking lot. Gibson confirmed this information in a separate interview with trial counsel.

A short time later, trial counsel received a notice of exculpatory evidence from the State, which provided that Gibson added information in a third statement to the State placing Deparvine at the apartment building around dusk without his backpack. However, trial counsel felt that Gibson added this portion to his

statement so the State would not call him to testify.[6] In addition, Deparvine never confirmed or denied that he ever left his apartment after he allegedly completed the sale; he always said that he returned to his apartment while Rick left in a second red truck.

Trial counsel also testified that he felt that Gibson's first two statements confirmed the police theory because he told detectives that he did not see a second red truck, but saw Deparvine with a backpack, which the State would consider Deparvine's "murder kit" (a backpack label was found inside the Jeep). Further, Gibson's repeated reluctance to testify was a concern because trial counsel feared that forcing Gibson to testify would result in the creation of adverse evidence, especially because trial counsel felt that Gibson knew more than he was willing to say. Indeed, although it was not suggested by the State or by Gibson that he fabricated any evidence to avoid testifying, Gibson, whose unrelated criminal trial was also quickly approaching, made reference to "not wanting to help himself" by testifying against Deparvine and not wanting to be a "snitch."

Deparvine testified at the evidentiary hearing that the backpack he carried that day contained a lock and chain for the Cheyenne because he lived in a bad neighborhood. Further, he testified that when Gibson observed him gesturing

---

6. Wayne Eaton, an individual who lived at Deparvine's apartment building, was deposed by trial counsel and stated that Gibson told him damaging information about Deparvine.

toward the north, what Gibson observed was his explanation to Karla of how to get to the back parking lot because the street adjacent to the apartment building was a one-way street. He also explained that he told trial counsel that on the night of the murders, he may have walked to the UPS store to get his mail, to the laundromat, or to the convenience store, but that his statement that he stayed in his apartment was in reference to not getting on the bus or leaving the immediate area.

After assessing all the testimony, the postconviction court found that Deparvine failed to carry his burden and demonstrate trial counsel's performance was deficient and that he was prejudiced by such deficiency. We agree. Deparvine's counsel's performance was not deficient for failing to call a witness who could potentially provide damaging testimony and repeatedly claimed that he would not testify. As the postconviction court found, trial counsel considered alternative strategies, but ultimately made a reasonable decision not to call a witness he perceived would be "roundly and soundly impeached" and lacked credibility.

This Court has previously found that a trial counsel's decision not to present a witness with questionable credibility was not ineffective. See Evans v. State, 995 So. 2d 933, 943 (Fla. 2008) (holding that trial counsel's tactical decision not to present witnesses with questionable credibility did not constitute ineffective assistance). Here, although Gibson testified at the evidentiary hearing and during

- 19 -

the investigation provided a statement to the State consistent with his testimony that he saw Deparvine at the apartment without his backpack around dusk, Gibson provided two prior inconsistent statements to police and one to trial counsel. Further, trial counsel recognized the potentially exculpatory value of this information—if Deparvine was at the apartment around dusk, he could not possibly be traveling north to Oldsmar with the Van Dusens—but noted that portions of Gibson's testimony were still highly damaging because the potential testimony would be consistent with the State's theory. Accordingly, Deparvine did not overcome the strong presumption that trial counsel's performance was not ineffective because the evidence establishes that trial counsel made a strategic decision, reasonable under the norms of professional conduct, not to call Gibson to testify at trial.

Even if Deparvine proved trial counsel's performance was deficient, he has failed to prove that the deficient performance undermines this Court's confidence in the verdict. First, Ferris' testimony regarding her phone conversation with Karla established that Karla was following Rick and the man who purchased the Cheyenne. This testimony would have been inconsistent with Gibson's testimony. Further, Gibson's other testimony would have been consistent with the State's theory and the State would have impeached Gibson if he testified that he saw

Deparvine at dusk around the apartment building for about half an hour. Accordingly, we affirm the postconviction court's denial of relief on this claim.

**B. Failure to Investigate and Subsequently Call Wendy Dacosta as a Witness**.

In this next claim, Deparvine alleges that trial counsel was ineffective for failure to competently investigate and call Dacosta as a witness at trial to testify that she saw a red truck near the Jeep at approximately 7:25 a.m. the day the Van Dusens' bodies were discovered. The postconviction court found that Deparvine failed to show that trial counsel's performance was deficient or that trial counsel's failure to call Dacosta would undermine the Court's confidence in the outcome of the trial. As explained below, we agree.

During her interview with the defense investigator, Dacosta stated that the truck she saw leaving the restaurant that was approximately fifteen to twenty feet away from Artistic Doors, the business where the Jeep was found, appeared to be the Cheyenne, although she described a truck that did not precisely match its description. She stated that the truck she saw had a tailgate with silver stripes on the top and bottom of the Chevrolet logo, which was written in silver in the middle of the tailgate. She also stated that she did not recall the truck she had seen having a black tonneau. The Cheyenne did not have silver stripes and had a black tonneau.

At the evidentiary hearing, Dacosta testified that she could not describe the front of the truck because she only saw it for a moment and was not paying much attention. She did pay attention to the tailgate area because the truck hurriedly pulled out in front of her. She remembered both the Jeep and the truck because it was unusual for vehicles to be there around 7:30 a.m., which is when she regularly commuted to work. When presented with a photograph of the Cheyenne at the evidentiary hearing, she wondered aloud whether it was the same truck she saw. She remembered that "Chevrolet" was written across the back of the truck, but thought it was more of a bold white color and did not recall a black tonneau. She then acknowledged that she had not been paying much attention at the time. She later stated it was more of an orange or orange-red color. She also described the driver of the truck as a white man with short hair like a crew cut.

Trial counsel testified at the evidentiary hearing that he felt Dacosta's testimony would be not helpful at worst and confusing at best because she initially identified the truck as the Cheyenne, but described it differently, and trial counsel felt that the jury would perceive that counsel was "grasping at straws" if he argued this was the alleged second red truck. Thus, the record demonstrates that trial counsel considered Dacosta's potential testimony, which, as shown above, was not altogether clear or confident either before the trial or at the evidentiary hearing, and chose not to present it in order to preserve his credibility with the jury.

Accordingly, Deparvine has failed to demonstrate that trial counsel's performance was deficient because trial counsel considered alternative courses and ultimately made a strategic decision that was reasonable under the norms of professional conduct. See Derrick v. State, 983 So. 2d 443, 460-61 (Fla. 2008) (quoting Occhicone, 768 So. 2d at 1048).

The record also demonstrates that, had Dacosta testified, it was improbable that the fairness and reliability of the proceedings would have been affected to such a degree as to undermine this Court's confidence in the verdict. See Ferrell, 29 So. 3d at 969. Dacosta could not identify with any specificity the appearance of the individual in the truck and wavered on her recollection of what the truck actually looked like. For instance, as noted above, she described it as more orange or orange-red than red. Further, as suggested by trial counsel, it would appear that he was "grasping at straws" by presenting the argument that the individual in a red truck—the true culprit—returned to the area to dispose of evidence or drop the I.D. card found next to the Jeep as a red herring more than two hours after the Jeep was seen parked at Artistic Doors and then hurriedly pulled out of a nearby restaurant's parking lot onto the highway. Accordingly, we affirm the postconviction court's order denying relief on this claim.

**C. Failure to Effectively Argue for Judgment of Acquittal on the "Armed Carjacking" Charge After the State's Case-in-Chief.**

In this claim, Deparvine alleges that trial counsel was ineffective for failing to make the following arguments during the motion for judgment of acquittal: (A) the State misrepresented the timeline of events; (B) the Jeep was not the object of the armed carjacking charge and the truck could not have been carjacked under the statute; (C) the Van Dusens did not have control over the truck; and (D) there was no carjacking because the Jeep was not the motive for the murders. Further, Deparvine contends that trial counsel was ineffective because his failure to challenge the indictment prior to trial on this basis was based on an unreasonable and outdated legal theory. The postconviction court found that trial counsel's performance was not deficient and Deparvine was not prejudiced by trial counsel's alleged deficient performance. We agree.

Trial counsel argued for judgment of acquittal at trial as follows: (1) there is no evidence that there was a continuous series of events; (2) there is no evidence showing how the Van Dusens were separated from the red truck and no evidence the separation occurred as a result of force, violence, assault, or being placed in fear; (3) there is no evidence that either vehicle was taken from the person or custody of the Van Dusens; and (4) the State failed to describe which vehicle was the object of the carjacking in the indictment. Thus, trial counsel specifically advanced arguments regarding sub-issues A and B and raised virtually the same argument raised in sub-issue C—trial counsel did not argue that the Jeep could not

be the subject of the carjacking because the State argued pretrial it was the Cheyenne, but he did argue that the State failed to specify which vehicle was the subject of the carjacking in the indictment and he argued that the State failed to prove either scenario. Regarding these sub-issues, Deparvine has failed to demonstrate how trial counsel's performance was deficient for failing to raise issues when the record demonstrates that such issues were raised. Further, Deparvine has failed to demonstrate prejudice on these sub-issues because the same arguments raised did not result in acquittal on the carjacking charges and this Court affirmed the denial of the judgment of acquittal on direct appeal. See Deparvine, 995 So. 2d at 374-76.

With respect to sub-issue D, this Court held on direct appeal that the State clearly advanced and argued the theory that the Cheyenne was the object of the carjacking charge. Id. at 374-75 ("We also reject Deparvine's contention that the State contended that the Jeep, not the truck, was the subject of the carjacking charge in count five. The State did not argue to the jury that the Jeep was the subject of the carjacking."). Further, Deparvine was convicted of one count of carjacking the Cheyenne. Thus, it is unclear how trial counsel's performance was deficient by failing to raise an argument for acquittal on a nonexistent charge or how trial counsel's allegedly deficient performance resulted in prejudice.

- 25 -

Accordingly, we find that Deparvine has failed to demonstrate deficient performance.

Deparvine also contends that trial counsel was ineffective because his failure to challenge the indictment prior to trial on this basis relied on an unreasonable and outdated legal theory. At the evidentiary hearing, trial counsel testified that he decided not to file a bill of particulars on the vagueness of the carjacking count because it could easily have been amended and the filing of a bill of particulars contending that the indictment was fatally defective for vagueness on count five might have alerted the State to what he considered more serious defects in count one. He explained that count one of the indictment failed to allege murder was committed with premeditation or a first-degree felony upon which one could base a conviction for first-degree murder. He believed this made it a manslaughter or second-degree murder charge. He conducted research on this topic and was aware of cases holding that citation to the statute cured any defects in an indictment, but ultimately felt that death cases were different. Although counsel was initially under the impression the carjacking count was in reference to the Jeep, Deparvine has failed to show how trial counsel's performance was deficient. As trial counsel noted, filing a bill of particulars would have likely resulted in an amended indictment. Further, trial counsel strategically chose not to file a bill of particulars alleging an unconstitutionally vague indictment because he suspected it would alert

the State of an issue with the murder counts. As stated previously, trial counsel cannot be considered ineffective when alternatives were considered and a strategic decision was made that is within the norms of professional standards.

Deparvine has also failed to demonstrate how trial counsel's deficient performance prejudiced him. Had trial counsel filed a bill of particulars to clarify the carjacking count, the State would have amended the bill of particulars and the same result would have likely occurred—a conviction for carjacking the truck and a conviction for felony murder and premeditated murder. Accordingly, we affirm the postconviction court's denial of relief on this claim.

### D. Failure to Impeach Paul Lanier.

In this claim, Deparvine alleges that trial counsel provided ineffective assistance of counsel for the following five reasons: (1) failure to rebut and impeach Paul Lanier on his claim that he followed Deparvine and Rick to Rick's home; (2) failure to present evidence that Lanier never made an offer of $13,000 to purchase the Van Dusens' truck; (3) failure to present evidence that Lanier was actually at the Van Dusens' home on Tuesday, November 18, 2003, and Sunday, November 23, 2003; (4) failure to call Assunta Fisher, Lanier's girlfriend, to refute Lanier's claim that the Van Dusens were still at home as late as 6:00 p.m. on Tuesday, November 25, 2003; and (5) failure to adequately impeach Lanier for his false representation of his educational background. The postconviction court

- 27 -

found that Deparvine failed to demonstrate deficient performance or prejudice on each claim. For the following reasons, we affirm the postconviction court's denial of relief on each claim.

1. Failure to Rebut and Impeach Lanier on his Claim That he Followed Deparvine and Rick to the Van Dusens' Home.

Deparvine alleges that trial counsel was ineffective for failing to impeach Lanier on his testimony at trial that he saw Deparvine driving the Cheyenne with Rick in the passenger seat approximately a week before the murders occurred. The State called Lanier as a witness at trial so that he could refute Deparvine's claim that he test-drove the Cheyenne on Sunday, which is when it ran out of gas, Deparvine cut his finger, and blood got on the steering wheel of the Jeep as he drove the Jeep back to the Van Dusens' home. According to Deparvine, both Sergeant Harry Hoover and Fisher should have been called to impeach Lanier because both would have testified that Lanier only visited the Van Dusens' home on Sunday, November 23, 2003, and he only stopped at the house because he saw the Cheyenne in the driveway. As explained below, we affirm the postconviction court's denial of relief on this claim.

At trial, Paul Lanier testified that about a week before the murders he met Deparvine and Rick as they returned from a test drive of the Cheyenne. He also testified that he saw Deparvine driving the Cheyenne with Rick as his passenger on Tuesday, November 18, 2003. On cross-examination, trial counsel impeached

- 28 -

Lanier's testimony by noting that: (1) Lanier had fourteen prior felony convictions instead of the thirteen he claimed he had while testifying on direct examination, (2) he was on probation for burglary and providing a false name to law enforcement, (3) he had a pending domestic violence charge that could still result in a violation of probation, and (4) he met with the Assistant State Attorney the weekend before his testimony, although he initially denied it. Further, trial counsel called Sergeant Hoover as a defense witness for purposes of impeaching Lanier on the accuracy of his testimony. Sergeant Hoover testified that Lanier only mentioned being at the Van Dusens' home on Sunday and he did not mention seeing the Cheyenne being driven by Deparvine, but saw an individual matching Deparvine's description at the home. Deparvine then testified on his own behalf that Lanier was at the Van Dusens' house on Sunday, November 23, 2003, looking at the Cheyenne and that Rick mentioned that Lanier had offered the full asking price to purchase it.

At the evidentiary hearing, Lanier testified that he visited the Van Dusens' home a total of two times during the week before and the week of Thanksgiving in 2003. He believed the first visit was on a weekend, and it occurred because the Van Dusens were selling their home and he saw Rick waxing the Cheyenne. Lanier then stated that he visited the Van Dusens the Tuesday after the previous visit, which was on a Sunday, after seeing the Cheyenne traveling north as he was

traveling south.  Rick was sitting in the passenger side and Deparvine was driving.

Lanier then followed the Cheyenne, but the Cheyenne accelerated as if its

horsepower were being tested.  He eventually drove to the Van Dusens' home

where he saw Rick and Deparvine outside the house.  Deparvine was wearing

"shades" and jeans.  After Deparvine left, Rick told Lanier he was going to deliver

the Cheyenne to Deparvine.  On cross-examination, Lanier testified that his

testimony at trial was more reliable and was truthful.  He also noted that he only

recalled two visits and would not have forgotten a third visit to the Van Dusens'

home.

Lanier's girlfriend, Assunta Fisher also testified at the evidentiary hearing.

She stated that she could not recall the exact dates she visited the Van Dusens'

home, but that she knew they were two days apart.  After her memory was

refreshed by use of her pretrial deposition, Fisher testified that the two dates she

visited were Sunday, November 23, 2003, and Tuesday, November 25, 2003.  She

testified that she could not recall the Cheyenne being driven.  However, she

testified that the individual that was at the Van Dusens' home looked similar to

Deparvine and acted "like it was a problem" that Lanier was interested in

purchasing the Cheyenne.

Trial counsel testified at the evidentiary hearing that Lanier's testimony at

trial was important because it placed Deparvine at the Van Dusens' home and he

saw Rick driving the Cheyenne back to the house with Deparvine as his passenger. He felt that Lanier's testimony, regardless of when he supposedly saw the test drive, was damaging, but he stated, "I suppose it would have been more damag[ing] had it occurred on Sunday."

We find that trial counsel's performance was not deficient or prejudicial. First, as noted previously, there is a strong presumption that trial counsel's performance was not ineffective. See Strickland, 466 U.S. at 690. Trial counsel impeached Lanier multiple times, including with Sergeant Hoover's testimony establishing that Lanier only mentioned one visit to the Van Dusens' home, which occurred on a Sunday, and never mentioned seeing Deparvine driving the Cheyenne. Further, Fisher's testimony does establish that Lanier did not visit the Van Dusens' home other than on Sunday and Tuesday, but she also testified that she could not recall whether she saw Deparvine driving the Cheyenne and that an individual matching Deparvine's description seemed upset at the possibility that Lanier would purchase the vehicle. Thus, trial counsel's performance was not deficient. Likewise, because Sergeant Hoover's testimony and other forms of impeachment already weakened the effect of Lanier's testimony, trial counsel's failure to call Fisher as a witness does not undermine this Court's confidence in the outcome of the proceedings.

2. Failure to Present Evidence That Lanier Never Made an Offer of $13,000 to Purchase the Van Dusens' Truck.

Deparvine alleges that trial counsel was ineffective for failing to impeach Lanier on his claim that he offered to purchase the Cheyenne for $13,000. According to Deparvine, had this testimony been impeached, the jury would have believed that Rick would have been free to accept the more firm offer of $6,500 from Deparvine. We affirm the postconviction court's denial of relief on this claim.

At trial, Lanier testified that he made an offer for the Cheyenne's asking price, $13,000, but told Rick that he needed about a week to get the cash together. Deparvine also testified at trial that Rick told him that Lanier had offered to pay the full asking price in cash. Fisher testified at the evidentiary hearing that no deal had been made, but that Lanier did offer to pay the full price or near the full price for the Cheyenne. However, Lanier stated that he needed time to get the cash. Further, as noted previously, trial counsel impeached Lanier in several different manners. Accordingly, Deparvine has failed to demonstrate how trial counsel's performance was deficient. Indeed, Deparvine corroborated the accuracy of Lanier's testimony.

Trial counsel's failure to present this evidence was also not prejudicial. As stated above, trial counsel impeached Lanier in several ways, Fisher would have corroborated Lanier's testimony, and Deparvine himself corroborated Lanier's testimony at trial.

3. Failure to Present Evidence That Lanier was at the Van Dusens' Home on Tuesday, November 18, 2003, and Sunday, November 23, 2003.

Deparvine alleges that trial counsel was ineffective for failure to present evidence that Lanier visited the Van Dusens' home on Tuesday, November 18, 2003, and Sunday, November 23, 2003, rather than on Sunday, November 23, 2003, and Tuesday, November 25, 2003. According to Deparvine, trial counsel should have let stand Lanier's testimony at trial regarding the November 18 date—where he observed Deparvine driving the Cheyenne instead of the Jeep—because it did not inculpate Deparvine. Further, had Fisher testified, she would have established that Deparvine was at the home on November 23, 2003, because she saw the Cheyenne in the Van Dusens' driveway, and her testimony would have negated Lanier's testimony indicating that he saw Deparvine driving the Cheyenne. Deparvine alleges that this impeachment is crucial because it would have eliminated the suggestion that Deparvine did not get blood on the steering wheel. We affirm the postconviction court's denial of relief on this claim.

At the evidentiary hearing, Fisher stated that she went to the Van Dusens' home on two occasions, a couple of days apart. Indeed, she testified that she visited the Van Dusens' home on Sunday and Tuesday before Thanksgiving. She also testified that she did not recall seeing anyone driving the Cheyenne, but noticed that the man at the Van Dusens' home on Sunday acted strangely when Lanier indicated an interest in the truck. Thus, Deparvine has failed to overcome

- 33 -

the strong presumption that trial counsel's performance was not ineffective for the following four reasons.[7]  See Strickland, 466 U.S. at 690.

First, Fisher's testimony would have placed Lanier at the Van Dusens' home on both Sunday, November 23, 2003, and Tuesday, November 25, 2003, but not on November 18, 2003.  Second, Fisher did not deny having seen anyone driving the Cheyenne, but only testified that she did not recall seeing anyone driving it.  This testimony would not have corroborated or impeached Lanier's testimony—the jury could have believed that Lanier was simply forgetting the dates.  Third, Fisher would have established that Deparvine, who testified that he was at the Van Dusens' home on Sunday, seemed to have an issue with Lanier's interest in the truck.  And fourth, Lanier's testimony was already extensively impeached, including with Sergeant Hoover's testimony establishing that Lanier never mentioned any other visits besides the Sunday visit and that he never mentioned seeing anyone driving the Cheyenne.  Accordingly, Deparvine has failed to demonstrate how trial counsel's performance was deficient or how trial counsel's

7.  It is also notable that in issue A, Deparvine argued that trial counsel failed to impeach Lanier with Sergeant Hoover's testimony that Lanier told him on Wednesday, November 26, 2003, that he had only been to the Van Dusens' home on Sunday, November 23, 2003, and did not mention seeing anyone drive the Cheyenne or any other visits to the Van Dusens' home.  Deparvine now argues that the November 18 date should not have been refuted, but the testimony establishing that he was observed driving the Cheyenne and not the Jeep should have been impeached.  The testimony of neither Fisher nor Sergeant Hoover, however, would have corroborated the November 18, 2003, date.

alleged deficient performance would undermine this Court's confidence in the verdict.

4. Failure to Call Fisher to Refute Lanier's Claim That the Van Dusens Were Still at Home as Late as 6:00 p.m. on Tuesday, November 25, 2003.

Deparvine alleges that trial counsel was ineffective for failure to call Fisher to establish that the Van Dusens were not at home as late as 6:00 p.m. on the date of the murders. As discussed previously, evidence in the form of cell phone records introduced by the State demonstrated that the Van Dusens left the Tierra Verde area, where their home was located, around 5:30 p.m. and arrived in the downtown St. Petersburg area, where Deparvine lived, around 5:50 p.m. In addition, cell phone records established that the Van Dusens were traveling north between 5:54 p.m. and 6:37 p.m. At this time, the Van Dusens were near Oldsmar. Further, the State called Chris Coviello, a neighbor of the Van Dusens, to testify that the Van Dusens left their home between 5:15 p.m. and 5:45 p.m. Thus, Fisher's testimony was unnecessary to establish that Lanier's testimony was inaccurate. Accordingly, Deparvine has failed to demonstrate how trial counsel's performance was deficient or how this deficiency resulted in prejudice.

5. Failure to Adequately Impeach Lanier for his False Representation of his Educational Background

Deparvine alleges that trial counsel was ineffective for failure to adequately impeach Lanier on his claim that he graduated from the University of South

Florida (USF). According to Deparvine, the USF's registrar's notarized document noting that Lanier never enrolled or graduated from USF was the most important impeachment tool to utilize against Lanier. We agree with the postconviction court and find that this claim is meritless.

During cross-examination of Lanier, trial counsel attempted to introduce the USF's registrar's notarized document, but the request to introduce the document as self-authenticating was denied. However, at the beginning of Deparvine's defense, trial counsel had the document admitted into evidence as Defense Exhibit 4. Thus, it was available to the jury. In addition, trial counsel testified at the evidentiary hearing that he did not discuss the document during closing arguments because he perceived that there were more important issues to discuss and because the jury ultimately could review the document during its deliberations. Accordingly, Deparvine has failed to demonstrate deficient performance because the document impeaching Lanier was admitted into evidence and trial counsel strategically chose to pursue other arguments during closing arguments.

Likewise, Deparvine has failed to demonstrate prejudice. Trial counsel heavily impeached Lanier's testimony during cross-examination and through the testimony of Sergeant Hoover. Trial counsel's alleged failure to adequately impeach Lanier on his educational background does not undermine this Court's

confidence in the verdict. Accordingly, we affirm the postconviction court's denial of relief on the foregoing claims.

### E. Failure to Present Evidence and Argument that Rick Van Dusen did not Reject a $15,000 Bid at Auction and for Failure to Challenge Stuart Myers on his Testimony That Van Dusen Set a Reserve Price of $17,000.

Deparvine alleges that trial counsel was ineffective for failing to argue that Rick did not reject a $15,000 bid at auction by setting a reserve price of $17,000 and for failure to challenge Stuart Myers on his testimony that Rick set a reserve price of $17,000. Further, trial counsel was ineffective for failing to present evidence and argument that the auction documents listed a reserve price of $1,700, and that if the $1,700 price was a typographical error, trial counsel should have objected to the document's introduction on the basis of unreliability. According to Deparvine, had trial counsel raised these arguments, the evidence would not have refuted Deparvine's claim that he purchased the Cheyenne for $6,500. The postconviction court found that Deparvine failed to overcome the strong presumption that trial counsel's performance was not ineffective. We agree.

At trial, evidence demonstrated that Rick placed the Cheyenne for sale at auction in March 2003. The record shows that trial counsel objected several times to the introduction of documents demonstrating that Rick set a reserve price of $17,000 at auction. Over his objection, however, the documents and testimony were admitted into evidence showing that the reserve price was $17,000 and the

final bid was $15,000. Although the basis of the objections was not that the typographical error on one document showing a $1,700 reserve price demonstrated the documents' unreliability, but rather that the documents were unreliable because they were based on Van Dusen's perceived value of the Cheyenne, were inadmissible as hearsay without exception because the documents were not prepared in the normal course of business by someone employed by the auction company, and were not properly authenticated. Further, trial counsel did not argue that the documents were unreliable based on the existence of one document depicting the reserve price as $1,700 because he believed it would make him look foolish to the jury in light of the $17,000 referenced in other documents. Thus, Deparvine has failed to demonstrate that trial counsel's performance was defective because the record shows that trial counsel made a strategic decision not to argue the reserve price was actually $1,700 or claim the documents were unreliable due to the presence of one typographical error. See Derrick, 983 So. 2d at 460-61 ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct."). Indeed, his argument would have been meritless because Rick's final advertisement, which was in November, noted that the truck was for sale at a listed price of "$13,700 or partial trade for four wheel drive jeep." It was, therefore, fairly evident that Rick would

not have set the reserve price at $1,700 eight months before advertising the truck at $13,700. Further, had the reserve price actually been $1,700, Rick's truck would have sold had it received a $15,000 bid. Accordingly, Deparvine failed to demonstrate how trial counsel's failure to raise this issue would undermine this Court's confidence in the verdict.

Trial counsel was also not deficient for failing to argue that Rick did not "reject" the $15,000 bid at the auction. Trial counsel testified that he did not think to object because the term "reject" was simply a manner of speech and that the jury ultimately understood the significance of the information. Further, as trial counsel noted, it can be inferred from the setting of a reserve price at $17,000 that Rick did not want to sell the truck for less than $17,000. In short, the same damaging information would have been established if the correct terminology was used— only a few months earlier, Rick believed his truck was worth at least $17,000, which is significantly higher than the alleged $6,500 purchase price. Thus, Deparvine has also failed to demonstrate how trial counsel's failure to object to the State's argument that Rick "rejected" a $15,000 bid prejudiced Deparvine. Accordingly, we affirm the postconviction court's denial of relief on this claim.

### F. Failure to Challenge Billie Ferris on the Accuracy of her Recollection of Karla Van Dusen's Statements.

Deparvine alleges that trial counsel provided ineffective assistance by failing to challenge Ferris on her recollection of her conversation with Karla on the night

of the murders. Specifically, Deparvine asserts that had trial counsel impeached her testimony that Karla told her, "he's got cash," there would have been reasonable doubt as to the accuracy of her recollection and it would have rebutted the State's theory that Deparvine killed the Van Dusens because he did not have the funds to purchase the vehicle. Further, it would have called into question the accuracy of her testimony that Karla was following the purchaser of the Cheyenne because he knew where to get the paperwork done. The postconviction court concluded that Deparvine failed to demonstrate that trial counsel's performance was deficient and that this Court's confidence in the outcome of the proceedings is undermined by trial counsel's failure to impeach Ferris on this statement. We agree.

First, although the postconviction court did not rule on whether trial counsel was ineffective for failing to object to the alleged leading question, it is evident that the State's direct examination was not in the form of a leading question. The State asked, "Did Karla Van Dusen tell you how the guy was going to pay for the truck that night?" Ferris answered, "She said he's got cash." Thus, this question did not suggest the answer to Ferris. Further, the question could not be answered by a mere "yes" or "no." Trial counsel cannot be ineffective for failing to pursue meritless arguments. See Owen v. State, 986 So. 2d 534, 543 (Fla. 2008) (citing Melendez v. State, 612 So. 2d 1366, 1369 (Fla. 1992)).

Second, the record demonstrates that trial counsel made a strategic decision to not aggressively impeach Ferris.[8]  Trial counsel testified at the evidentiary hearing that he believed that other things, like Ferris' statement that they were following Deparvine, were more important to discuss because they contradicted Deparvine's assertion that he stayed in his apartment while the Van Dusens left in a second red truck.  He further testified that he chose not to challenge her memory after she suffered a stroke shortly before trial because he felt they would use her prior consistent statements and have Sergeant Hoover repeat his testimony regarding what she told him shortly after the murders.  Further, he testified that he did not want to appear mean or even suggest that she was lying because she already had the sympathy of the jury because she was Karla's mother.  Accordingly, trial counsel's performance was not deficient because he strategically chose not to impeach Ferris during cross-examination, which was reasonable under the norms of professional conduct.  See Derrick, 983 So. 2d at 460-61.

---

8.  Deparvine argues that trial counsel should have used prior statements to impeach Ferris because her recollection was strongest at the time she made statements to investigators soon after the murders.  Deparvine then contends that trial counsel should have then made the argument that the damaging portions of Ferris' initial statements and trial testimony were inaccurate.  In short, Deparvine asserts that trial counsel should have made the dual argument to the jury that helpful portions of Ferris' statements were most accurate at the time of the murders, but all damaging portions of the statement at the time of the murders were inaccurate.

In addition, the record demonstrates that trial counsel's failure to impeach Ferris during cross-examination would not undermine this Court's confidence in the verdict. Trial counsel noted in closing arguments that Ferris was perhaps misremembering things because she could not remember how long her conversation with Karla lasted, only remembered one phone call even though the cell phone records showed two phone calls, and could not recall specifically telling Sergeant Hoover that Rick had to drop the price a "couple thousand dollars." Further, trial counsel argued that the sale was complete because Ferris testified that Karla did not say anything about having to get any documents notarized, a bill of sale, or getting the rest of the money. He also discussed that there was no remaining paperwork to be done that night other than going to a tag office, which would have been closed at that time. In addition, this Court found the statements, "He knows where to get the paperwork done tonight," and "[h]e's got cash," inadmissible as hearsay without exception, but nevertheless ruled that the admission of those statements was harmless error. Deparvine, 995 So. 2d at 371. Indeed, as this Court held on direct appeal, the most damaging portion of Ferris' testimony was that it placed Deparvine with the victims, which is contrary to Deparvine's testimony. Id. at 372 (noting that this testimony was "especially damaging to Deparvine because it placed him with the victims traveling north . . . on the evening in question and it directly contradicted Deparvine's testimony that

- 42 -

he did not travel with the victims after he purchased the truck."). Finally, it is noteworthy that Ferris' testimony provides that Karla said, "I'm following Rick and the guy that bought the truck." The use of the term "bought" could suggest that Karla believed the sale was complete, which trial counsel argued during closing argument. Accordingly, we affirm the postconviction court's denial of this claim.

### G. Failure to Object to Hearsay Testimony by Billie Ferris or Failure to Emphasize the Exculpatory Elements of the Testimony.

Deparvine again alleges, albeit in different fashion, that trial counsel provided ineffective assistance of counsel in dealing with Ferris' testimony. His argument here is that trial counsel should have argued to the jury that the phone call between Karla and Ferris occurred as they were driving around the block to complete the sale of the truck in the back parking lot of Deparvine's apartment. This claim is claim 17 in the postconviction motion. Deparvine, however, did not raise this specific argument below. In claim 17 below, Deparvine argued that trial counsel should have argued that Ferris' use of "bought" was consistent with the sale being complete at the beginning of that phone call—the postconviction court found that Deparvine failed to demonstrate prejudice on this claim, citing the same reasons as discussed above in the previous claim. Accordingly, this issue was not preserved for appellate review because it was not raised in his postconviction motion. Wickham v. State, 124 So. 3d 841, 853 (Fla. 2013) (citing Green v. State,

975 So. 2d 1090, 1104 (Fla. 2008), and Henyard v. State, 883 So. 2d 753, 759 (Fla. 2004)).

Further, despite the title of the claim, Deparvine has not advanced an argument that trial counsel failed to "preserve harmful error" analysis by objecting to the introduction of Ferris' statements. "The purpose of an appellate brief is to present arguments in support of the points on appeal . . . [and] to merely refer to arguments presented during the postconviction proceedings without further elucidation is not sufficient to preserve issues." Sexton v. State, 997 So. 2d 1073, 1086 n.14 (Fla. 2008) (quoting Doorbal v. State, 983 So. 2d 464, 482 (Fla. 2008)). Even if the issue had been preserved, Deparvine has failed to prove counsel was ineffective for failing to object or preserve harmless error because trial counsel did object to the introduction of this testimony on several occasions[9] and this Court held on direct appeal that the postconviction court erred in ruling certain portions of Ferris' testimony admissible.

Further, Deparvine has failed to preserve the argument that trial counsel was ineffective for failing to argue the exculpatory elements of Ferris' testimony. Even if this issue was fully preserved, trial counsel was not ineffective for failing to

_____

9. Prior to trial, Deparvine moved in limine to preclude the State from introducing Ferris' testimony. This motion was denied. At trial and before opening statements, the objections were renewed, but again were denied. When Ferris testified, trial counsel renewed the objection and asked for a continuing objection to anything Ferris testified to regarding the phone conversation.

argue that Ferris' conversation with Karla took place as the Van Dusens and Deparvine were going to the back parking lot. Trial counsel testified at the evidentiary hearing that he probably did not make this argument because he believed other things were more important. Indeed, trial counsel's closing argument advanced the theory that the phone records must have been wrong because two calls overlapped. He also noted that Ferris could not remember how long her conversation with Karla was and only remembered one phone call even though the cell phone records showed two phone calls. Ferris could also not recall specifically telling Sergeant Hoover that Rick had to drop the price "a couple thousand dollars." Further, he argued that the sale had been completed because Ferris testified that Karla did not say anything about having to get any documents notarized, a bill of sale, or getting the rest of the money. Also, trial counsel observed that there was no remaining paperwork to be done that night other than going to a tag office, which would have been closed at that time. In short, he argued that Ferris' memory must have been inaccurate because the sale was complete and paperwork was shown to be unnecessary. Accordingly, trial counsel's performance was not deficient because he strategically chose to concentrate on this evidence and argument rather than attempt to convince the jury that Ferris' conversation with Karla occurred during the five minutes it took to

drive to the back parking lot and complete the sale.  See Derrick, 983 So. 2d at 460-61.

In addition, trial counsel's failure to advance this argument did not affect the fairness and reliability of the proceeding so as to undermine this Court's confidence in the outcome.  See Ferrell, 29 So. 3d at 969.  As discussed above, trial counsel argued that Ferris' memory was inaccurate, the phone records were incorrect, and that the sale had been completed.  Further, the jury was presented with Deparvine's testimony that the sale only took approximately five minutes and that the Van Dusens left with an individual in a second red truck.  The jury rejected this argument.  Accordingly, this Court's confidence in the verdict is not undermined by the failure to make this argument at trial.

**H.  Failure to Fully Develop Evidence and Cross-Examine Peter Wilson.**

Deparvine alleges that trial counsel was ineffective when he failed to develop evidence and cross-examine Peter Wilson, who testified that he spent a good portion of time on the day of the murders with Rick inside the Jeep, but did not see any bloodstains on the steering wheel.  The postconviction court found that Deparvine did not demonstrate deficient performance or prejudice and we affirm the denial of relief on this claim.

The evidence at trial established that at least six bloodstains on the steering wheel matched Deparvine's DNA.  Wilson's testimony at trial established that he

- 46 -

believed the Jeep was in "immaculate condition" and that he did not see any of the six stains on the steering wheel despite being a passenger in the Jeep for approximately an hour and a half to two hours. At the evidentiary hearing, Wilson reiterated his trial testimony and also stated that he had an opportunity to observe the dashboard near the steering wheel because he leaned toward the GPS, which was on top of the dashboard, just to the right of the steering wheel. At the evidentiary hearing, Detective Ronald Cashwell testified that an individual seated in the passenger seat would be in a position to see blood on the steering wheel without illumination.

During closing arguments, trial counsel argued that the presence of Deparvine's DNA in the truck was circumstantial evidence because the State could only prove its existence, but not how or when it got there. Further, he asked the jury to ponder why Deparvine's blood was not present anywhere else in the vehicle. He then showed the jury the photographs the State entered into evidence and noted that the jury would not be able to see anything on the steering wheel. He also argued that this lack of visual evidence of blood indicated that it was likely a small amount that nobody noticed between Sunday and the day of the murders.

Trial counsel explained his rationale for not cross-examining Wilson at the evidentiary hearing. He stated that he did not want to cross-examine a witness without having anything to ask, anything to "jam them on," or "nothing to mitigate

the damaging thing they had said." He felt that Wilson would have simply repeated on cross-examination that he was in the car for a long time in broad daylight and did not see any stains on the steering wheel. Then, on redirect examination, Wilson would again repeat that he did not see any blood.

As noted above, although trial counsel did not cross-examine Wilson, trial counsel did actually develop evidence and argument regarding the visibility of bloodstains at trial. Further, he explained that he purposely chose not to cross-examine Wilson because his cross-examination would have little substance and would ultimately result in the repetition of damaging testimony. In short, he chose to limit Wilson's damaging testimony to direct examination only and rebut or attempt to mitigate this damaging testimony during closing arguments. Based on the record, trial counsel considered and rejected alternative courses, and counsel's decision was reasonable under the norms of professional conduct. Accordingly, trial counsel's performance was not deficient. See Derrick, 983 So. 2d at 460-61.

Likewise, trial counsel's failure to cross-examine Wilson would not undermine this Court's confidence in the outcome of the trial. As discussed above, trial counsel did not cross-examine Wilson, but did emphasize during closing arguments that the State's evidence showed that the bloodstains would not have been noticeable by anyone from Sunday to Tuesday. Accordingly, Deparvine has

- 48 -

failed to show either deficient performance or prejudice.  Thus, we affirm the postconviction court's order denying relief on this claim.

## I.  Failure to Call Paul Dombrowski, Nicholas Klein, and Bill Jamison's Wife as Defense Witnesses Concerning Deparvine's Wristwatch.

Deparvine alleges that trial counsel was ineffective for failing to call Paul Dombrowski, Nicholas Klein, and Bill Jamison's wife as witnesses to establish that Deparvine owned a Rolex watch.  The postconviction court found that trial counsel made a strategic decision not to call these witnesses and that because Dombrowski's and Klein's testimony lacked credibility, this Court's confidence in the verdict would not be undermined.  For the following reasons, we agree and affirm the postconviction court's denial of relief on this claim.

Trial counsel testified at the evidentiary hearing that he chose not to call Klein because he felt Klein would not have been helpful.  On cross-examination at the evidentiary hearing, Klein testified that he told the defense investigator that Deparvine was paid by inmates for law clerk services with cash, had never heard of him being paid with a Rolex, and had never seen him with a Rolex.  Indeed, Klein testified that Deparvine owned a gold-colored watch, but could not corroborate whether Deparvine owned a Rolex, whether the watch had jewels, or indicate the color of the face of the watch.  Trial counsel considered the possibility of calling Klein as a witness, but ultimately chose not to because Klein could not corroborate whether Deparvine owned a Rolex.  Accordingly, trial counsel's performance was

- 49 -

not deficient because his decision was strategic and not outside the norms of professional standards. Further, it is highly unlikely this Court's confidence in the outcome of the verdict would be undermined by Klein's testimony regarding prison culture—corruption made it relatively easy and common to have expensive jewelry, which was somewhat like cash in prison, and that Deparvine's law clerk position was a lucrative position in prison—or his testimony about the watch. Indeed, as Deparvine himself acknowledged at the evidentiary hearing, although the testimony about prison culture could have established that he may have had the opportunity to acquire such a watch, the testimony would also establish that inmates lie, manipulate, and sometimes use force to obtain other individuals' personal property. Such testimony would undermine the credibility of Klein's testimony because he is a prison inmate.

Regarding Dombrowski, trial counsel testified that he chose not to call him because he felt he would be a horrible witness, did not remember any specific details about the watch, and indicated that he would not want to reveal how many prior convictions he had. At the evidentiary hearing, Dombrowski testified that prior to the day he was available to testify, he could only tell trial counsel that Deparvine had a nice watch, but remembered the watch the night before because he was flipping through a magazine and found an advertisement for a Rolex watch that matched Deparvine's. He was unable to inform trial counsel that his memory

had been triggered by the advertisement and he never mentioned this revelation to anyone until the evidentiary hearing. Further, although he may have expressed reluctance to trial counsel about admitting to the amount of his prior convictions at trial, he would have candidly testified about his prior convictions if told he was required to do so. Even if this Court were to consider Dombrowski's testimony credible, trial counsel was unaware that Dombrowski suddenly recalled the watch the night before he was available to testify. Trial counsel's performance pursuant to Strickland must be evaluated from counsel's perspective at the time. See Strickland, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Accordingly, trial counsel's performance was not deficient because he made a strategic decision not to call a witness he believed lacked credibility and could only state that Deparvine's watch was nice. Further, as discussed above regarding Klein, this Court's confidence in the outcome of the verdict is not undermined by Dombrowski's testimony regarding the watch or his testimony about prison culture.

Regarding Jamison's wife, Jamison was a terminally ill inmate whom Deparvine had befriended and allegedly gave Deparvine the Rolex watch. Deparvine only alleges that she should have been called if Klein and Dombrowski

had explained prison culture and how inmates would manipulate family members into giving those inmates cash even though they had valuable items. It is not clear from Deparvine's argument how Jamison's wife would have assisted his claim and he does not provide such an explanation. According to trial counsel and Deparvine's brief, Jamison's wife did not recall Jamison owning a Rolex or any other material items. Thus, her testimony would not help Deparvine corroborate his testimony that he had a Rolex watch or that prison inmates manipulate family members. Accordingly, we affirm the postconviction court's denial of relief on this claim.

### J. Failure to Request a Limiting Jury Instruction Addressing the Voluntariness of the Van Dusens' Association with Deparvine.

Deparvine alleges that trial counsel was ineffective when he failed to seek a jury instruction or argue to the jury that there was no evidence Deparvine forced the Van Dusens to go to Hillsborough County and remain there for hours until their deaths. According to Deparvine, the absence of evidence of kidnapping lessens the impact of the State's scenarios given the gap of time between the Van Dusens' arrival in Oldsmar and the approximate times of their deaths. The postconviction court found that Deparvine failed to establish either deficient performance or prejudice. For the following reasons, we agree.

Trial counsel cannot be deemed ineffective for failing to raise a meritless claim. Simmons, 105 So. 3d at 495 (citing Owen, 986 So. 2d at 543). As the

postconviction court noted, it was unlikely that the trial court would have granted a limiting jury instruction on a charge that was no longer pending, especially where the instruction sought would have stated that the State had not presented sufficient evidence of a kidnapping and that the Van Dusens were voluntarily with Deparvine. Further, even if argument was presented that Deparvine was acquitted on the kidnapping charges, such acquittal did not mean that Deparvine demonstrated that the Van Dusens were with him voluntarily. Also, the State's inability to prove kidnapping does not suggest that Deparvine did not commit armed carjacking or murder the victims. Thus, trial counsel's performance was not deficient and Deparvine failed to demonstrate how trial counsel's failure to stress the absence of evidence of kidnapping by jury instruction or argument to the jury would undermine this Court's confidence in the outcome of the trial. Accordingly, we affirm the postconviction court's order denying relief on this claim.

**K. Failure to Challenge Henry Sullivan's Claim That He Lost His Florida Identification Card in June 2003.**

Deparvine alleges that trial counsel was ineffective for failure to challenge Henry Sullivan's claim that he lost his Florida I.D. card in June 2003. Specifically, Deparvine alleges that skillful utilization of the timing of Sullivan's brother's visit, which occurred around October 2002, would have contributed to a reasonable doubt that Deparvine was the only person likely to have come into possession of Sullivan's lost I.D. card, which was found on the ground next to the Jeep on the

day the Van Dusens' bodies were discovered. The postconviction court found that Deparvine failed to demonstrate either prong of <u>Strickland</u>. For the following reasons, we affirm the postconviction court's order denying relief on this claim.

At trial, Sullivan testified that his brother visited him in October 2002. After the visit, Sullivan replaced his I.D. card. The issue date of the I.D. found at the scene was November 26, 2002. Sullivan testified that he again lost his I.D., and obtained another new one somewhere around June 2003. Ava Nowak from the Florida Department of Highway Safety and Motor Vehicles (DMV) testified that Sullivan obtained a new I.D. card on August 5, 2003. Frank Crane, who managed a hotel from May 9, 2003, to June 30, 2003, testified at trial that Sullivan and Deparvine rented rooms at the same time. Thus, it is unclear how any argument could have been persuasively made to raise the possibility that the November 26, 2002, I.D. card was the one that went missing when Sullivan's brother visited him around October 2002 and Sullivan testified that he noticed his I.D. was missing in June 2003. Further, although not testifying regarding this claim, trial counsel testified at the evidentiary hearing that the less said about the I.D. card the better because "the suggesting that it was this remarkable coincidence that these people were, in fact, killed or kidnapped or whatever they were, murdered or robbed by someone who used to live in Mr. Deparvine's apartment house [. . .] [s]omeone totally unconnected to the Van Dusens I felt would have been a ludicrous defense

or proposition to pursue." Thus, Deparvine failed to prove ineffective assistance of counsel on this claim because trial counsel cannot be deemed ineffective for failing to raise a meritless claim. Simmons, 105 So. 3d at 495. Further, trial counsel's failure to raise this argument does not undermine this Court's confidence in the outcome of the proceedings—the State introduced evidence to demonstrate that both Sullivan and his brother were not involved in this murder. Accordingly, we affirm the postconviction court's denial of relief on this claim.

**L. Failure to Present Evidence and Argument That the Detectives Failed to Conduct a Proper Investigation.**

Deparvine alleges that trial counsel was ineffective for failing to develop the evidence and present to the jury the fact that the investigation was fatally flawed because detectives focused solely on Deparvine and failed to follow up on other leads in the case. For instance: (1) there was no evidence that detectives searched the DMV's records for trucks of similar vintage and body style in the area; (2) the driver of the second vintage red truck was selling a Jeep that Rick wanted to look at, but there was no evidence that detectives made any effort to locate the seller of that Jeep; (3) because a neighbor heard Karla's voice on the night of the murders, reasonable investigators would have conducted a search of the victims' home specifically to look for the missing cash, but such search was not conducted; and (4) the detectives never told Deparvine why he was arrested or that they found blood on the steering wheel. The postconviction court found that trial counsel's

- 55 -

performance was not deficient and that trial counsel's allegedly deficient performance did not prejudice Deparvine. For the following reasons, we affirm the postconviction court's denial of relief on this claim.

At the evidentiary hearing, Sergeant Hoover indicated that the investigation involved checking registrations to determine how many red trucks were registered in Florida, and that none of Deparvine's neighbors or individuals questioned at traffic surveys near Artistic Doors confirmed seeing a second red pickup truck. The traffic surveys and questioning of individuals who lived near Artistic Doors and where the bodies were found did not focus on Deparvine. During the interviews with Deparvine, Sergeant Hoover became suspicious because Deparvine described the man in the second red truck as similar to himself in age, build, facial hair, and aviator sunglasses, which Sergeant Hoover believed was preparation of a cover story. Deparvine also declined to come to the police department to help with a sketch of the man in the second red truck.

Sergeant Hoover also testified that law enforcement conducted a thorough search of the Van Dusens' home and did not find any cash. Also, bank records did not show any cash deposits. Further, trial counsel cross-examined Sergeant Hoover on the circumstances of the alleged test drive. Deparvine testified at trial that he returned to the Van Dusens' house to retrieve a gas can and then Rick and he drove the Jeep back to the Cheyenne. Sergeant Hoover testified that in prior

interviews Deparvine said Rick and he went back to the house to get a gas can and then they drove back to the Cheyenne with Karla.

At trial, the evidence also showed that law enforcement did not solely focus on Deparvine during the investigation. For instance, law enforcement executed a search warrant for Sullivan's home wherein two guns (a silver Bryco nine-millimeter and an Intertec nine-millimeter) and a knife with unique features were found. Erika Henderson, firearms laboratory analyst, testified that the casing recovered from the ground where Karla lay, the casing recovered from the floor board of the Jeep, and the bullets retrieved from Rick's and Karla's heads during the autopsy were all fired from the same gun. However, Henderson concluded that the casings were not fired from a Bryco nine-millimeter and could not render any conclusive findings on the Intertec nine-millimeter because the gun was broken.

Trial counsel also testified at the evidentiary hearing, albeit discussing the fingerprint on the I.D. card, that he did not think arguing to the jury regarding the effectiveness of the investigation was typically a good argument unless the investigation was particularly poorly done or there was evidence that the defendant was framed. He then stated that this case was not an example of particularly poor investigative work. Thus, given trial counsel's testimony that he did cross-examine Sergeant Hoover regarding Deparvine's blood and that the details provided by Deparvine could not be corroborated, Deparvine has failed to

demonstrate how trial counsel's performance was deficient or how the presentation

of any of the evidence Deparvine believes trial counsel should have presented

would have likely undermined this Court's confidence in the outcome.

Accordingly, we affirm the postconviction court's denial of relief on this claim.

### M. Failure to Effectively Investigate and Introduce Evidence at Trial Regarding Fingerprints on an I.D. Card Found at the Scene of the Murder.

Deparvine alleges that trial counsel was ineffective for failure to effectively

investigate and introduce evidence at trial regarding fingerprints on the I.D. card

found next to the Jeep. Deparvine contends that effective investigation, which

revealed that the print belonged to Deputy Poore, one of the deputies who handled

the I.D. card at the crime scene, would have established a problem with the sanctity

of the evidence and raised a reasonable doubt in the minds of the jury. The

postconviction court found that trial counsel considered the defense of a shoddy

investigation as well as the defense of an unknown print belonging to the real killer

and strategically opted for the latter. Thus, the postconviction court concluded that

trial counsel made a reasonable tactical decision in not submitting the identifiable

latent print for further identification. Further, the court noted that Deparvine failed

to establish prejudice. We agree.

At trial, chief forensic print analyst Mary Ellen Holmberg testified that she

analyzed the print lifted off Sullivan's I.D. card, but it did not match that of

Deparvine. At the evidentiary hearing, the current chief forensic print analyst of

the Hillsborough County Sheriff's Office and former FDLE crime lab analyst testified that she compared one latent print of value to the known fingerprints of Deputy Poore. The print was a match to Deputy Poore. There was one other print/ridge detail that was evidence of a finger making contact with the card, but it was not of value for comparison. She also testified that there was no way of determining whether Poore's fingerprint destroyed or damaged another print that could have been of value. Further, she noted that at the time of the trial, FDLE compared the print of value to the criminal database, which did not include deputies.

Trial counsel testified at the evidentiary hearing that he considered that perhaps the unidentified print showed that the investigation was not handled well, but that he did not know it was a deputy's fingerprint at the time of the trial. However, he did not want to test the print against those of officers because he was probably as "happy as I was going to get with the fact that we had an apparently potentially important piece of evidence that had an unidentifiable print on it that wasn't Mr. Deparvine's" and "it was more valuable to have an unknown print" rather than "proving they didn't do a good investigation." Further, he stated, "[I]t's not clear to me how proving that that was Deputy Poore's fingerprint helps Mr. Deparvine" because it would show that it was not the "crooks" or the "bad guys" but actually a deputy's print. He reasoned that the unknown print argument

works best unless there is a shoddiness that goes well beyond what happened in this case because there was no obvious incompetence or "smoking gun."

He also disagreed with postconviction counsel's assertion that there were other mystery prints on the I.D. card, stating that the other prints were of no value for comparison purposes and were only evidence that someone touched the card. When asked directly whether knowledge that the print belonged to Poore would help challenge the sanctity of the evidence, trial counsel responded:

> My belief at the time and my belief now was that the less said about that card the better because I felt that for various and sundry reasons it was probably some of the most damaging evidence against Mr. Deparvine. I felt that given the big picture it was . . . the suggesting that it was this remarkable coincidence that these people were, in fact, killed or kidnapped or whatever they were, murdered or robbed by someone who used to live in Mr. Deparvine's apartment house. Someone totally unconnected to the Van Dusens I felt would have been a ludicrous defense or proposition to pursue.

Finally, he stated, "And no, I don't think to challenge the way that card had been handled by police would have translated to how they handled the DNA evidence or anything else directly." Thus, the record demonstrates that trial counsel considered the possible defense of shoddy investigation, but opted to argue that the unidentified latent print of value belonged to the real killer. Accordingly, trial counsel's performance cannot be deemed deficient because he made a tactical decision. See Derrick, 983 So. 2d at 460-61.

Likewise, Deparvine has failed to demonstrate how trial counsel's failure to argue that there was a shoddy investigation or investigate and develop the fingerprint argument undermines this Court's confidence in the verdict. See Ferrell, 29 So. 3d at 969. Had trial counsel presented the evidence that Deputy Poore mishandled the I.D. card, that would only have demonstrated that the police mishandled the I.D. card. As trial counsel suggested, it would not have logically led to the conclusion that the rest of the investigation or handling of evidence was likewise mishandled. Further, the implication remained that Deparvine, who lived in the same apartment house as Sullivan, had access to the I.D. card and left the I.D. next to the Jeep as a red herring. Accordingly, we affirm the postconviction court's denial of relief on this claim.

Deparvine also raised, as a subclaim, the argument that the State violated Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. U.S., 405 U.S. 150 (1972), by failing to provide this exculpatory evidence and knowingly presenting or failing to correct testimony known to be false. Deparvine, however, failed to raise this claim until closing arguments. Thus, the postconviction court properly found that the claims were procedurally barred because they were insufficiently pled. See Darling v. State, 966 So. 2d 366, 379 (Fla. 2007) (holding that trial court properly summarily denied claim that was only raised in written closing argument after the conclusion of the evidentiary hearing).

### N. Failure to Monitor the Status of the Cheyenne During the Pendency of the Trial.

Deparvine alleges that trial counsel was ineffective for failing to have undertaken the task of monitoring the status of the Cheyenne, which was sold by the Van Dusens' estate prior to the completion of Deparvine's <u>Spencer</u> hearing[10] and judgment and sentence. Further, Deparvine raised a due process claim in closing arguments alleging the State improvidently relinquished control of the Cheyenne without notice or hearing. The postconviction court denied relief on these claims. For the following reasons, we affirm the denial of relief.

### 1. Ineffective Assistance of Counsel Claim

Deparvine argues that trial counsel was ineffective in failing to monitor the status of the Cheyenne, but also notes that the Sheriff's Office's unilateral relinquishment of control of the Cheyenne without notice or hearing suggests that trial counsel's efforts would have been futile. The postconviction court did not rule on the first prong of <u>Strickland</u>, deficient performance, finding only that no prejudice resulted from the failure to monitor the status of the Cheyenne. Even assuming trial counsel's failure to monitor the sale of the Cheyenne two years after the murders occurred constitutes deficient performance, Deparvine has failed to demonstrate prejudice.

---

10. Deparvine's hearing was held on November 22, 2005.

Deparvine has failed to demonstrate how the sale of the Cheyenne for $6,000 undermines this Court's confidence in the verdict. At trial, a State expert witness testified that the value of the Cheyenne at the time of the murders was approximately $15,500. Deparvine's expert testified that it was worth $7,500 and emphasized that much of the work done on the Cheyenne was unprofessional. Although Deparvine argues that evidence of the sale corroborates Deparvine's witness' testimony, the circumstances of the estate's sale of the Cheyenne were different than the circumstances at the time the Van Dusens were murdered.

Michelle Kroger, Rick's daughter, and beneficiary and trustee of the Van Dusens' estate, testified for the State during the evidentiary hearing. She first learned of the role of the Cheyenne in the murders during Deparvine's trial and eventually viewed it as the reason Rick and Karla were murdered. Michelle did not care about procuring market value for the Cheyenne. She was seven months pregnant at the time and continued ownership of the vehicle was stalling the resolution of the estate, rather than helping the family move on. She stated that selling it on her own was not an option for her because Rick and Karla were murdered during the sale. As a result, her cousin provided assistance in obtaining minor repairs and eventually selling the Cheyenne. Michelle did not have it appraised prior to placing a $10,000 asking price on the Cheyenne. She received an offer of $9,000, but the buyer wished to make payments. She testified that she

could not accept payments because she did not know the interested buyer and because the estate was involved. Ultimately, there was little interest and she accepted a $6,000 offer because she wanted to get rid of the Cheyenne and money was not an issue. Thus, the sale of the Cheyenne for $6,000 would not have been evidence of its market value two years earlier and does not establish that Rick, with different circumstances and motivating factors, would have sold it to Deparvine at the price of $6,500. Further, even if the evidence of its sale after Deparvine's conviction was understood by a jury to mean that Rick would have sold it for $6,500, this evidence did not minimize the effect of the DNA evidence present on the Jeep's steering wheel, Ferris' testimony that Karla said she was following the buyer of the Cheyenne, and the absence of any proof that the Van Dusens received a $6,500 cash payment. Accordingly, we affirm the postconviction court's denial of relief on this claim.

2. Due Process Claim

Finally, Deparvine argues that the actions of the State Attorney's Office and Sheriff's Office in unilaterally disposing of the truck, critical evidence used at trial, without notice or hearing was a violation of his due process rights. This argument was not specifically raised in either the initial postconviction motion, the reply to the State's response to the motion, or the amended postconviction motion. Deparvine raised this specific claim for the first time in closing arguments. Thus,

the postconviction court properly summarily denied this claim as insufficiently pled. See Darling, 966 So. 2d at 379 (holding that trial court properly summarily denied claim that was only raised in written closing argument after the conclusion of the evidentiary hearing). Accordingly, we affirm the postconviction court's denial of relief on these claims.

We now turn to a discussion of Deparvine's other claims on appeal.

## 2. Newly Discovered Evidence

Deparvine also raised a related claim that the estate's sale of the Cheyenne for $6,000 constitutes newly discovered evidence that necessitates a new trial. To obtain a new trial based on newly discovered evidence, the defendant must show that evidence was not known by the trial court, the party, or counsel at the time of trial and the defendant could not have known of it by use of due diligence. The defendant must also show that the evidence is of such a nature that it would probably produce an acquittal on retrial. Johnston v. State, 27 So. 3d 11, 18-19 (Fla. 2010). To reach this conclusion, the trial court is required to consider all newly discovered evidence, if admissible, and then evaluate the weight of both the newly discovered evidence and the evidence that was admitted at trial. Jones v. State, 709 So. 2d 512, 521 (Fla. 1998). Further, the second prong is met if the newly discovered evidence weakens the case against the defendant so as to give

rise to reasonable doubt as to his culpability. Heath v. State, 3 So. 3d 1017, 1023-24 (Fla. 2009).

Here, the postconviction court did not make a finding on whether Deparvine demonstrated that the evidence was not known by the trial court, the party, or counsel at the time of trial and the defendant could not have known of it by use of due diligence. Even assuming, however, that the evidence was not discoverable through due diligence, it is evident that the potentially newly discovered evidence did not weaken the case against the defendant so as to give rise to reasonable doubt as to his culpability. As noted above, the circumstances of the estate's sale of the Cheyenne were entirely different than the circumstances present when the Van Dusens attempted to sell it. Further, this evidence does not minimize the importance of the DNA evidence present on the Jeep steering wheel, Ferris' testimony that Karla was following the buyer of the Cheyenne, and the absence of any proof that the Van Dusens received a $6,500 cash payment. Accordingly, we affirm the postconviction court's denial of relief on this claim.

### 3. Constitutional Challenges

**A. Execution by Lethal Injection Constitutes Cruel and Unusual Punishment.**

Deparvine contends that the postconviction court erred in summarily denying his claim that Florida's lethal injection procedure violates the Eighth Amendment to the United States Constitution, but does not specifically request an

evidentiary hearing on this claim. Deparvine concedes that this Court has repeatedly rejected challenges to Florida's lethal injection protocol, but nonetheless argues that Florida's procedures, training, and methods are unconstitutional in light of Florida's "unique history of botched executions," which creates a substantial and objectively intolerable risk of harm. Deparvine contends that a reasonable alternative is to follow the practices set out by veterinarians to euthanize animals. For the following reasons, we affirm the postconviction court's summary denial of Deparvine's claim.

This Court made clear in Pardo v. State, 108 So. 3d 558, (Fla. 2012), cert. denied, 133 S. Ct. 815 (2013), in rejecting Pardo's constitutional challenge to the use of pentobarbital in lethal injection procedures, that to raise a successful Eighth Amendment challenge, the defendant must demonstrate that "the conditions presenting the risk must be 'sure or very likely to cause serious illness or needless suffering,' and give rise to 'sufficiently imminent dangers.' " Id. at 562 (quoting Baze v. Rees, 553 U.S. 35, 49-50 (2008) (plurality opinion (quoting Helling v. McKinney, 509 U.S. 25, 34-35 (1993))). Further, this Court held in Pardo that in making such a challenge, the defendant cannot rely on conjecture or speculation. Pardo, 108 So. 3d at 563. Here, Deparvine does not offer any specific rationale for why the lethal injection procedures are unconstitutional, but merely alleges that Florida's history of "botched" executions mandates a determination that the lethal

injection procedures are unconstitutional. Because the Court has rejected this claim and because Deparvine has proffered nothing new that would require an evidentiary hearing, we affirm the postconviction court's order summarily denying relief on this claim. See Valle v. State, 70 So. 3d 530, 538-39 (Fla. 2011) (recognizing that Florida's lethal injection protocol has remained essentially unaltered since this Court's decision in Lightbourne v. McCollum, 969 So. 2d 326, 349 (Fla. 2007), holding such protocol to be constitutional).

**B. Lethal Injection Procedures, Coupled with Section 945.10, Florida Statutes, Which Prohibits Deparvine From Knowing the Identity of Specified Members of the Execution Team, Violate His Constitutional Rights.**

Deparvine alleges that section 945.10, Florida Statutes (2013), is unconstitutional because it prohibits the disclosure of the identity of the members of the execution team and the executioners, thus precluding him from determining the adequacy of their qualifications and training. The postconviction court summarily denied this claim. Deparvine does not specifically request an evidentiary hearing on this claim. Because we have repeatedly rejected challenges to the constitutionality of section 945.10 on the merits, we affirm the postconviction court's summary denial of this claim. See, e.g., Troy v. State, 57 So. 3d 828, 841 (Fla. 2011); Darling v. State, 45 So. 3d 444, 448 (Fla. 2010); Heynard v. State, 992 So. 3d 120, 130 (Fla. 2008); Provenzano v. State, 761 So. 2d 1097, 1099 (Fla. 2000); Bryan v. State, 753 So. 2d 1244, 1250-51 (Fla. 2000).

In addition, as of this date the Governor has not signed a death warrant for Deparvine; consequently, even if ordered to do so, the Department of Corrections could not state with any certainty who Deparvine's eventual executioners will be. In light of this Court's consistent and summary rejection of challenges of this nature, the postconviction court did not err in summarily denying Deparvine's claim.

## C. Prohibition of Juror Interviews to Determine Whether Constitutional Error Occurred Violates Constitutional Principles.

Deparvine challenges the constitutionality of rule 4–3.5(d)(4) of the Rules Regulating the Florida Bar on First, Sixth, Eighth, and Fourteenth Amendment grounds. The postconviction court summarily denied this claim. For the following reasons, we affirm.

This Court has repeatedly held that such claims are procedurally barred and rejected similar claims. In Troy, this Court held:

> Rule 4–3.5(d)(4) precludes a lawyer from initiating communication with any juror concerning a trial with which the lawyer is connected, "except to determine whether a verdict may be subject to legal challenge." Under the rule, "a lawyer may not interview jurors for this purpose unless the lawyer has reason to believe that grounds for such challenge may exist." R. Regulating Fla. Bar 4–3.5(d)(4). Troy's constitutional challenge to this rule fails for two reasons. First, this claim is procedurally barred because it should have been raised on direct appeal. See Reese v. State, 14 So. 3d 913, 919 (Fla. 2009) (citing Israel v. State, 985 So. 2d 510, 522 (Fla. 2008)). Second, even if the claim was not procedurally barred, we have repeatedly rejected constitutional challenges to rule 4–3.5(d)(4). Id. (citing Barnhill v. State, 971 So. 2d 106, 117 (Fla.

- 69 -

2007)) (rejecting claim that rule 4–3.5(d)(4) violates a defendant's constitutional right of equal protection). "Furthermore, where the defendant merely complains about the 'inability to conduct "fishing expedition" interviews,' the claim is without merit." Evans v. State, 995 So. 2d 933, 952 (Fla. 2008) (quoting Johnson v. State, 804 So. 2d 1218, 1225 (Fla. 2001)). Thus, Troy is not entitled to relief on this subclaim.

Id. at 841-42. As in Troy, Deparvine's claim is both procedurally barred because it was not raised on direct appeal and meritless. Specifically, Deparvine's claim amounts to nothing more than a complaint about the inability to conduct "fishing expedition" interviews. Accordingly, we affirm the postconviction court's summary denial of this claim.

### D.  Section 921.141, Florida Statutes, is Facially Vague and Overbroad in Violation of the Eighth and Fourteenth Amendments to the Constitution.

Deparvine contends that the trial court's instruction to the jury that its role is advisory diminished its responsibility, contrary to Caldwell v. Mississippi, 472 U.S. 320 (1985). The United States Supreme Court held in Caldwell that it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Id. at 328-29. For two reasons, Deparvine is not entitled to relief. First, Deparvine failed to raise this claim on direct appeal. Thus, this claim is procedurally barred. See Lukehart v. State, 70 So. 3d 503, 521-22 (Fla. 2011) ("This Court has repeatedly stated that Caldwell claims are proper on direct appeal and cannot be raised for the first time

on collateral review."); see also Troy, 57 So. 3d at 842; Hitchcock v. State, 991 So. 2d 337, 361 (Fla. 2008). Second, the claim that this instruction diminishes the jury's sense of responsibility is meritless. See Troy, 57 So. 3d at 842; see also Lebron v. State, 982 So. 2d 649, 666 (Fla. 2008); Card v. State, 803 So. 2d 613, 628 (Fla. 2001); and Brown v. State, 721 So. 2d 274, 283 (Fla. 1998). Accordingly, we affirm the postconviction court's summary denial of this claim.

**E. Florida's Capital Sentencing Statute is Unconstitutional as Applied Under the Sixth, Eighth, and Fourteenth Amendments of the Constitution.**

Deparvine claims that his sentence is unconstitutional pursuant to Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring, 536 U.S. 584, because Florida's capital sentencing scheme does not require that the State charge the aggravating circumstances and does not require unanimous jury findings regarding sentencing aggravating factors. The postconviction court summarily denied this claim without an evidentiary hearing. We affirm.

First, Deparvine's Ring claim was raised on direct appeal, which this Court rejected. See Deparvine, 995 So. 2d at 379. Thus, this claim is procedurally barred because issues raised and rejected on direct appeal cannot be relitigated in postconviction proceedings. Everett v. State, 54 So. 3d 464, 485 (Fla. 2010) (holding that Ring and Apprendi claims were procedurally barred because they were raised and rejected on direct appeal).

Second, even if this claim were not barred, Deparvine's claim is meritless. One of the aggravating factors found by the trial court in this case, prior violent felony, rests on the contemporaneous murder convictions. "This Court has repeatedly held that where a defendant is convicted of multiple murders, arising from the same criminal episode, the contemporaneous conviction as to one victim may support the finding of the prior violent felony aggravator as to the murder of another victim." Francis v. State, 808 So. 2d 110, 136 (Fla. 2001) (citing Mahn v. State, 714 So. 2d 391, 399 (Fla. 1998); Walker v. State, 707 So. 2d 300, 317 (Fla. 1997)). Thus, Ring does not apply to Deparvine's sentences because he had a prior violent felony conviction. See Chandler v. State, 75 So. 3d 267, 269 (Fla. 2011) (holding that prior felony convictions are exceptions to the requirements of Ring); see also Frances v. State, 970 So. 2d 806, 822-23 (Fla. 2007) (rejecting application of Ring when the death sentence was supported by the prior violent felony aggravating circumstance based on contemporaneous convictions for murder). This Court has also rejected claims that Ring requires the aggravating circumstances to be individually found by a unanimous jury verdict. See Hodges v. State, 885 So. 2d 338, 359 nn.9-10 (Fla. 2004); Blackwelder v. State, 851 So. 2d 650, 654 (Fla. 2003); Porter v. Crosby, 840 So. 2d 981, 986 (Fla. 2003). Accordingly, we affirm the postconviction court's summary denial of this claim.

**F. Florida's Capital Sentencing Statute is Unconstitutional as Applied and on its Face for Failure to Prevent the Arbitrary and Capricious Imposition of Capital Punishment and for Constituting Cruel and Unusual Punishment**.

Deparvine claims that Florida's capital sentencing scheme violates due process rights and constitutes cruel and unusual punishment on its face and as applied to him. In particular, Deparvine argues that Florida's death penalty statute does not ensure that defendants are not sentenced to death in an arbitrary manner. The postconviction court summarily denied this claim without an evidentiary hearing. We affirm.

This claim is procedurally barred because Deparvine should have and could have raised this claim on direct appeal. See Troy, 57 So. 3d at 844 (holding that defendant was procedurally barred from raising a claim that Florida's capital sentencing statute fails to prevent the arbitrary and capricious imposition of the death penalty because the claim could have and should have been raised on direct appeal) (citing Jones v. State, 928 So. 2d 1178, 1182-83 n.5 (Fla. 2006)). Further, this Court has consistently held that this claim is without merit. Suggs v. State, 923 So. 2d 419, 441 (Fla. 2005); Knight v. State, 923 So. 2d 387, 414 (Fla. 2005) (citing Provenzano v. State, 739 So. 2d 1150 (Fla. 1999), and Jones v. State, 748 So. 2d 1012 (Fla. 1999)); Hodges, 885 So. 2d at 359 n.9. Thus, we affirm the postconviction court's summary denial of this claim.

Deparvine also raises the related claim that he received ineffective assistance of counsel on this claim. The postconviction court summarily denied this claim. We affirm and find that this claim is meritless. Deparvine failed to prove ineffective assistance of counsel on this claim because trial counsel cannot be deemed ineffective for failing to raise a meritless claim. Simmons, 105 So. 3d at 495. Accordingly, we affirm the postconviction court's summary denial of these claims.

### 4. Cumulative Error

Deparvine contends that errors demonstrated in the proceedings below cumulatively entitle him to a new trial. We explained in Troy concerning cumulative error:

We have held:

> Where multiple errors are discovered in the jury trial, a review of the cumulative effect of those errors is appropriate because "even though there was competent substantial evidence to support a verdict . . . and even though each of the alleged errors, standing alone, could be considered harmless, the cumulative effect of such errors [may be] such as to deny to defendant the fair and impartial trial that is the inalienable right of all litigants in this state and this nation."

McDuffie v. State, 970 So. 2d 312, 328 (Fla. 2007) (alterations in original) (quoting Brooks v. State, 918 So. 2d 181, 202 (Fla. 2005)). However, where the allegations of individual error are procedurally barred or meritless, a claim of cumulative error also fails. See Israel

[v. State, 985 So. 2d 510, 520 (Fla. 2008)] (citing Parker v. State, 904
So. 2d 370, 380 (Fla. 2005)).

Troy, 57 So. 3d at 844. Deparvine has failed to establish that any errors occurred,

which, either individually or cumulatively, would entitle him to a new guilt phase

trial. Accordingly, we affirm the postconviction court's denial of relief on all of

the foregoing claims. Finally, we consider Deparvine's petition for a writ of

habeas corpus.

## II. Petition for a Writ of Habeas Corpus

Deparvine's petition for a writ of habeas corpus raises two claims of

ineffective assistance of appellate counsel. Claims of ineffective assistance of

appellate counsel are appropriately presented in a petition for a writ of habeas

corpus. Wickham, 124 So. 3d at 863 (citing Valle v. Moore, 837 So. 2d 905, 907

(Fla. 2002)). The standard of review for ineffective appellate counsel claims

mirrors the Strickland standard for ineffective assistance of trial counsel.

Wickham, 124 So. 3d at 863. In order to grant habeas relief on ineffectiveness of

appellate counsel, this Court must determine:

> first, whether the alleged omissions are of such magnitude as to
> constitute a serious error or substantial deficiency falling measurably
> outside the range of professionally acceptable performance and,
> second, whether the deficiency in performance compromised the
> appellate process to such a degree as to undermine confidence in the
> correctness of the result.

Id. (citing Pope v. Wainwright, 496 So. 2d 798, 800 (Fla. 1986) (citing Johnson v. Wainwright, 463 So. 2d 207, 209 (Fla.1985))). An appellate counsel will not be deemed ineffective for failing to raise meritless issues or issues that were not properly raised in the trial court and are not fundamental error. Valle, 837 So. 2d at 908. For the following reasons, we deny Deparvine's petition for a writ of habeas corpus.

Deparvine's first contention is that his conviction for carjacking the Cheyenne was a conviction for a charge never made as represented by the State in the judgment of acquittal argument. Further, Deparvine contends that a conviction based on a charge not made by indictment or information is a nullity and that this was a fundamental error that appellate counsel should have recognized and argued. Deparvine then notes that, instead, without the proper arguments and citations, this Court denied relief on direct appeal because it had not been raised in the trial court. Thus, according to Deparvine, appellate counsel was ineffective. We deny relief on this claim.

As this Court has previously noted, habeas corpus "is not a second appeal and cannot be used to litigate or relitigate issues which could have been . . . or were raised on direct appeal." Breedlove v. Singletary, 595 So. 2d 8, 10 (Fla. 1992); see also Taylor v. State, 3 So. 3d 986, 1000 (Fla. 2009) (holding that a petitioner "cannot relitigate the merits of an issue through a habeas petition or use

an ineffective assistance claim to argue the merits of claims that either were or should have been raised below"). Here, appellate counsel raised this identical claim in the initial brief. See Appellant's Initial Br., Issue IV, p. 48-55.[11] This Court rejected his claim. See Deparvine, 995 So. 2d at 374 ("[W]e reject any claim that the indictment insufficiently described the motor vehicle that was the subject of the carjacking. Deparvine did not attack the indictment on this ground in the trial court."). Thus, this claim is procedurally barred because it was raised and rejected on direct appeal.

Deparvine's second contention is that appellate counsel was ineffective for failing to argue that the Van Dusens were not in a position to exercise custody or control over the Cheyenne, which is a requirement under the carjacking statute. Deparvine contends that had this argument been raised, both the carjacking and felony murder convictions would have been reversed. This claim, however, was raised and rejected on direct appeal. Accordingly, we deny Deparvine's petition for a writ of habeas corpus on this claim.

On direct appeal, appellate counsel's initial brief did not specifically cite to the statute or artfully allege that the Van Dusens did not have custody or control of

---

11. Issue IV was titled, "The evidence was legally insufficient to prove carjacking; in addition the trial court committed fundamental error by failing to ensure jury unanimity on the carjacking count, where the indictment and instructions failed to specify which vehicle—the Jeep Cherokee or the Chevy pickup truck—was the subject of the alleged carjacking."

the Cheyenne. Appellate counsel argued in the initial brief that the State had not introduced evidence "concerning anything that may have transpired between the Van Dusens and appellant . . . during the hours after the last phone activity and before the homicides, and there was no evidence whatsoever regarding the whereabouts of the truck." Appellant's Init. Br., Issue IV, p. 49. Further, appellate counsel noted that the Cheyenne could not have made any of the tire impressions where the bodies were found or where the Jeep was found. Id. at 49-50. Later, appellate counsel specifically argued that there was an " 'utter void' in the evidence" and "it cannot be assumed that—even if legal title had not yet been transferred—the Van Dusens did not at some point consensually relinquish possession of the truck."

In the reply brief, appellate counsel also contended, "The evidence does not show when or how appellant obtained possession of the truck. . . . The evidence does, however, show that the truck was not at the scene where the shooting occurred. Even under the broadest interpretation of a carjacking statute, this does not qualify." Appellant's Reply Br., p. 24-25 (citing Alvarez v. State, 963 So. 2d 757, 764 (Fla. 3d DCA 2007) ("Here, . . . the victim was unaware of the theft. We conclude, as we did in that case, that under these circumstances the [L]egislature did not intend for a carjacking conviction to lie.")). Thus, although appellate counsel did not specifically use the words "custody" or "control," he argued that the carjacking

conviction for the truck could not stand because it could not be assumed that Deparvine did not obtain possession of the truck and the truck was not at the scene where the shooting occurred. In short, appellate counsel suggested that the State did not prove that the Van Dusens were in possession or control of the truck. This Court rejected the claim and held that "[w]hether the Van Dusens were murdered after Deparvine took possession is irrelevant since a reasonable jury could infer from the evidence that the taking was the consequence of a continuous series of acts or events all focused on the taking of the truck." Deparvine, 995 So. 2d at 376. Accordingly, we deny Deparvine's petition for a writ of habeas corpus because this claim is procedurally barred.

## CONCLUSION

Based on the foregoing, we affirm the postconviction court's order denying postconviction relief on all claims. We also deny relief on both claims Deparvine raised in his petition for writ of habeas corpus.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, and PERRY, JJ., concur.
CANADY, J., concurs in result.

NO MOTION FOR REHEARING WILL BE ALLOWED.

An Appeal from the Circuit Court in and for Hillsborough County,
    Susan G. Sexton, Judge - Case No. 292004CF000774000AHC
And an Original Proceeding – Habeas Corpus

- 79 -

David Robert Gemmer, Assistant Capital Collateral Regional Counsel-Middle Region, Tampa, Florida,

    for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida and Stephen D. Ake, Assistant Attorney General, Tampa, Florida,

    for Appellee/Respondent